## Case No. 11,024.

### The PETERHOFF.

[Blatchf. Pr. Cas. 463; [1] Betts' Pr. Cas.]

District Court, S. D. New York. Aug. 1, 1863.[2]

PRIZE—EXAMINATION OF WITNESSES AND CARGO— EVIDENCE — NEUTRAL VESSEL AND NEUTRAL PORT — CONTRABAND OF WAR — RESISTANCE TO VISITATION AND SEARCH—SPOLIATION OF PAPERS.

1. On motion of the district attorney, acting under instructions from the government, a mail bag, under the official seal of the general post-office of Great Britain, found on board of the prize vessel, was ordered by the court to be delivered to the district attorney, to be by him disposed of conformably to the instructions of the government.

2. The attorney for the United States is, by law, official master of suits prosecuted by the United States in the prize court, and has authority, at his discretion, to offer to or withhold from the consideration of the court any particular of testimony relative to a prize suit in prosecution in court, under his discretion.

[Cited in Confiscation Cases, 7 Wall. (74 U. S.) 457.]

3. In this case the court made an order for the unlading, opening, and examination of the cargo, to ascertain its nature and quality.

4. The court refused to allow a witness, who was a passenger on the prize vessel, and who had been examined in preparatorio, to be re-examined for the purpose of showing his personal loyalty, on the ground that the question of his individual loyalty or disloyalty was of no importance, and that his political status was shown to be that of an enemy.

5. Under the special circumstances of this case the court permitted the master of the prize vessel to be re-examined on the standing interrogatory as to the destruction of papers, and ordered him to be at the same time examined on three special interrogatories framed by the court,

---

[1] [Reported by Samuel Blatchford, Esq.]
[2] [Reversed in 5 Wall. (72 U. S.) 28.]

although the testimony of all the witnesses had been filed in court and an order made that the proofs be opened.   [Case No. 11,022.]

6. The court struck out from the testimony of the master, as irrelevant, a statement made by him as to another witness, which was not responsive to any part of the standing interrogatories.

7. A prize commissioner has no right to put to a witness any interrogatories except the standing ones, or those specially framed by the court for the particular case.

8. The court rejected, as evidence, a statement made on the record by the prize commissioner in regard to the reluctance of a witness to answer.

9. A document produced for the first time at the hearing, and forming no part of the depositions in the case, is not admissible in evidence.

10. Although such document, if properly put in evidence, would be regarded by the court as a very material piece of evidence against the vessel and her cargo, yet the court did not, upon the proofs in the case, entertain any such doubt upon the question of condemning the vessel and cargo, as to make it proper to direct an order for further proof in order to permit the introduction in evidence of the document.

11. In prize cases, the court of that district into which the property is carried and proceeded against, has jurisdiction.

12. The mere carrying of a vessel, or of her cargo, seized on the high seas as prize of war, into any particular district, without the institution there of any proceedings in prize, cannot affect or take away the jurisdiction over the property of the district court of another district, in which the proceedings against the property may be instituted after the property has been carried into such other district.

13. A neutral vessel, laden with a neutral cargo, may lawfully trade between neutral ports, in time of war, in all descriptions of merchandize, contraband or otherwise, without being liable to seizure by a belligerent.

14. But a seizure is justifiable if a vessel be engaged in carrying contraband of war for or to the enemy, or to the port of the enemy; and all contraband goods, even though belonging to neutrals and found in neutral bottoms, are liable to capture and condemnation, if seized by a belligerent while on a destination for the uses of the enemy of such belligerent.

15. The principles announced by this court in the cases of the Stephen Hart [Case No. 13,-364] and The Springbok [Id. 13,264], affirmed.

16. A prize court will not shut its eyes to a well known and obvious system of conducting trade with the enemy in contraband articles.

17. Effect of a claim put into prize property by underwriters who had insured it against capture.

18. A person who was a citizen of the United States, residing in Texas at the time of the breaking out of the war, and has never owed any allegiance to any foreign country, is to be regarded as a citizen of the enemy's country, in prize proceedings, and cannot appear as a claimant in them, because he has no persona standi in court.

19. Implements and munitions of war which, in their actual condition, are of immediate use for warlike purposes, are to be deemed contraband whenever they are destined to the enemy's country or to the enemy's use.

20. All military equipments and military clothing are regarded as contraband articles. In England all manufactured articles which, in their natural state, are fitted for military use, or for building and equipping ships-of-war,

among which articles cordage is included, are contraband in their own nature.

21. The probable use of articles is inferred from their destination; and if articles capable of military use are going to a place where any need of their employment in military use exists, it will be presumed that they are going for military use, although it is possible that they might have been applied to civil consumption.

22. In this case the vessel, although ostensibly on a voyage from London to neutral waters at the mouth of the Rio Grande, was laden with a cargo composed largely of articles contraband of war, which were not designed, on their departure from England, to be sold or disposed of in the neutral market of Matamoras, but were designed to be delivered, either directly, or indirectly by trans-shipment, in the country of the enemy and for the use of the enemy.

23. The refusal of the master of a neutral merchant vessel to permit the papers of his vessel to be taken on board of a belligerent cruiser when demanded, to be there examined by the commander of the cruiser, especially after those papers have been already so far examined on board of the merchant vessel, by a subordinate officer from the cruiser, as to excite suspicion concerning their regularity, is, on the part of the neutral master, a resistance to the right of visitation and search, even though he offers his papers for examination on board of his own vessel, and his vessel for search.

24. Papers on board of the vessel were destroyed at the time of her capture, some by being burned and some by being thrown overboard by order of the master.

25. False evidence by the master as to the destruction of the papers.

26. The spoliation of papers on board of a neutral vessel, when overhauled by a belligerent cruiser, is of itself a strong circumstance of suspicion.

27. In England and in the United States spoliation of papers is not held to furnish of itself sufficient ground for a condemnation, but to be a circumstance open to explanation; yet, if the explanation be not prompt or frank, or be weak and futile, if the case labors under heavy suspicions, or if there be a vehement presumption of bad faith or gross prevarication, it is ground for the denial of further proof, and condemnation ensues from defects in the evidence, which the party is not permitted to supply.

28. Deficiencies in the manifest in respect to the contraband articles on board.

29. The absence of invoices as to some of the contraband articles.

30. Defects in the bills of lading.

31. Character and quantity of the contraband portion of the cargo.

32. Character and status of some of the passengers on the vessel.

33. Notwithstanding the ostensible destination of the vessel to neutral waters at the mouth of the Rio Grande, the evidence establishes the actual hostile destination of the cargo.

34. All the claimants of the vessel and cargo had on board contraband articles, which were destined to be delivered directly, or indirectly by trans-shipment, into the enemy's country, and for the use of the enemy.

35. When contraband articles, destined for the use of the enemy, are found on board of a vessel, all other goods on board of that vessel belonging to the owner of the contraband articles, even those goods which are innocent, must share the fate of the contraband goods.

36. Whether the English doctrine is sound that contraband goods are liable to capture, even though destined to a neutral port, if found entering waters common to both the neutral port and a hostile port. Quere.

37. Where the vessel belongs to the owner of the contraband articles, or where there are circumstances of fraud as to the papers, or the destination of the papers or the cargo, and thus an attempt, under colorable appearances to defeat the rights of a belligerent, the vessel which carries the contraband articles will be condemned, and the penalty on the vessel will not be limited merely to a loss of freight and expenses.

38. So, too, the vessel will be condemned not only where her owner is privy to the carriage of contraband, but where the master of the vessel, as the agent of such owner, interposes so actively as to consent to give additional color to it by sailing with false papers.

39. So, also, if the owner of a vessel places it under the control of a master who permits it to carry, under false papers, contraband goods ostensibly destined to a neutral port, but in reality going to the country of the enemy, he must sustain the consequence of such misconduct on the part of his agent.

40. A neutral owner of a vessel is, as a general rule, held responsible for all the acts of the master of his vessel committed in violation of the rights of a belligerent.

41. A master is, in time of war, bound to know the contents of his cargo, and cannot be permitted to aver his ignorance of the contents of contraband packages on board of his vessel.

42. From the moment a vessel, having on board contraband articles, which have a destination to the enemy's country, leaves her port of departure, she may be legally captured, and it is not necessary to wait until the goods are actually endeavoring to enter the enemy's country, the penalty attaching the moment the illegal transportation commences.

[43. Cited in Wood v. Fowler, 26 Kan. 687, to the point that the court will take judicial notice of the situation of a town in a foreign country, and that a bar exists at the mouth of the river at which it lies, which vessels of the draught of the vessel libeled cannot cross.]

In admiralty.

BETTS, District Judge. The steamer Peterhoff was captured, as lawful prize of war, on the 25th of February, 1863, by the United States steamer Vanderbilt, off the island of St. Thomas, about four and one-half miles from the outer road or mouth of the harbor. She was placed in charge of a prize-master, who proceeded with her to Key West. The United States district judge, the marshal, and the district attorney being absent on her arrival at Key West, the prize-master reported to Admiral Bailey, the naval officer in command at Key West, who ordered the prize-master to proceed with the prize to New York. She arrived there on the 28th of March, and the libel in this case was filed on the 30th of March.

On the 21st of April, 1863, Stephen Jarman, the master of the Peterhoff, intervening for the interest of the owners of the vessel and her cargo, filed a claim to the vessel and her cargo, on behalf of such owners, as his principals, not disclosing any names, but averring that he was master of the vessel at the time of her seizure, duly appointed by her owners, and was their lawful agent, and the rightful bailee of the vessel and cargo.

The test oath to this claim was made by Captain Jarman, and averred that the vessel and cargo belonged to British subjects. The claim denied the lawfulness of the seizure, and prayed for a restoration of the vessel and cargo to him or to his principals.

On the same day, Robert Mackie, of New York, the agent of Lloyd's, intervening for the interest of the underwriters of the Peterhoff and her cargo, filed a claim to both, for such underwriters. He averred, in the claim, that the vessel and her cargo were fully insured by his principals, and that the ownership of both was vested in them, and denied the lawfulness of the capture, and prayed the restoration of the vessel and cargo to him or to his principals. The test oath to this claim was made by Mr. Mackie, and averred that the vessel and cargo belonged, at the time they were seized, to subjects of Great Britain.

On the 22d of April, 1863, a claim was filed by Samuel J. Redgate, in which he represented himself as "late of Texas, and lately a political refugee from that state, but more recently sojourning in Great Britain, merchant, intervening for himself, as owner, agent, and consignee of a large portion of the cargo of the said steamer Peterhoff, of the value of three hundred and seventy-five thousand dollars, or thereabouts." He claimed so much of the cargo as stood in his name "as owner or consignee, or under power of attorney to act as consignee or agent, for himself and principals," and stated that he was bona fide owner, consignee or agent of that portion of the cargo, and was employed to attend to and protect the interests in that portion, and to demand restitution thereof, with damages for unlawful detention "in behalf of himself as owner, consignee or agent, and also in behalf of the underwriters," and denied the lawfulness of the capture. The test oath to this claim was made by Redgate, and averred that such portion of the cargo belonged to him as owner, consignee, agent, &c., as set forth in the claim.

On the same day, George W. Almond, who represented himself as a "resident of the city of London, and a subject of the crown of Great Britain, merchant, intervening for himself as owner, and as agent and consignee, of a portion of the cargo of said steamer Peterhoff, of the value of one hundred and fifty thousand dollars, or thereabouts," filed a claim to "that portion of said cargo which stands in his name as owner or consignee, or under power of attorney to act as consignee or agent, for himself and principals," and stated that he was bona fide owner, consignee or agent of that portion of the cargo, and was authorized to attend to and protect the interests in that portion of the cargo, and to demand restitution thereof, with damages for unlawful capture and detention, "in behalf of himself as owner, consignee, or agent, and also in behalf of the underwriters," and denied the lawfulness of the capture. The test oath to this claim was

made by Almond, and averred that the above-named portion of the cargo belonged to him as owner, consignee, agent, &c., as set forth in the claim.

The depositions in preparatorio, taken in the case, are those of Stephen Jarman, master, Henry Bound, first mate, Walter N. Harris, second mate, Christopher H. Tregidgo, third mate, Robert Bowden, George W. Almond, and Samuel J. Redgate, passengers, John Murphy, chief engineer, John Murphy, first assistant engineer, Thomas Webber, steward, George Duffay, fireman, James Diamond, cook, and John Reed and John J. Campbell, seamen. These depositions were all taken in April, 1863. Jarman, Bowden and Almond having been examined on the 1st, Redgate on the 1st and 20th, Bound on the 2d, Murphy, first assistant engineer, Diamond and Reed on the 4th, Webber on the 6th, Harris and Tregidgo on the 11th, and Murphy, chief engineer, Duffay and Campbell on the 13th.

Among the articles found on board of the Peterhoff at her capture was a mail bag, which was delivered by the prize master to the prize commissioner. This bag was under the official seal of the general postoffice of Great Britain. On the 21st of April, 1863, an affidavit, made by the district attorney, as attorney for the United States and the captors, was presented to the court, in which he set forth that he had carefully examined all the ship's papers and evidence taken in preparatorio in this case, and had inspected the British mail packages found on board of the vessel; that the mail appeared to be bona fide, authenticated, sealed, public government mail of Great Britain, found on board of a commercial vessel, apparently navigated between London, in England, and Matamoras, in Mexico; that the said evidence furnished no proof that the said mail was false or spurious or simulated, or otherwise than genuine; and that he, as attorney for the United States and the captors, under his general authority as district attorney, and under special authority from the government, consented that said mail be given up, to be sent to its destination. Upon this affidavit, an application was made to the court, by the district attorney, that he have leave to withdraw the mail bag from the custody of the court. The special counsel for the captors opposed the application, but the court, on the 22d of April, made an order, which recited that the attorney for the United States was, by law, official master of suits prosecuted by the United States in the prize court, and had thereby authority, at his discretion, to offer to or withhold from the consideration of the court any particular of testimony relative to a prize suit in prosecution in court, under his discretion, and directed that the mail bag be delivered to the attorney for the United States, out of the custody of the court, to be by him disposed of conformably to the instructions of the government of the United States. The counsel for

the claimants were present in court when this application was made, but they made no opposition to the granting of the same.

On the 25th of April, 1863, an affidavit was presented to the court, made by the prize master who brought the Peterhoff to New York, setting forth that she was laden with a large cargo packed in boxes, bales, and cases, the true character of which could not otherwise be ascertained than by the unlading, opening, and inspection thereof; that such papers as were found on board of the vessel very imperfectly disclosed the true contents of the bales, cases, and boxes, and described the same as "merchandise" simply, except in a few instances of artillery boots and army shoes and blankets; and that he had been informed, by persons composing the crew of the captured vessel, that packages of papers of the vessel were burned or thrown overboard as the vessel was about being captured. Upon this affidavit, and on the application of the United States and the captors, an order was made by the court, directing the marshal to cause the cargo of the vessel to be unladen, and stored in a safe warehouse having sufficient accommodations for the unpacking and inspection of the cargo, and appointing three competent persons, Messrs. Edwin Gerard, Henry H. Elliott, and Orison Blunt, to examine and make an inventory of the cargo upon its unlading, and to open the boxes, cases, and bales, and remove their contents, so far as should be necessary to ascertain the nature and quality of the cargo, and to report to the court the particulars, names, descriptions, and assortments of the goods, with their marks and numbers, and the nature, use, quantities, and qualities thereof, and any fact they might discover and deem material in the premises, and that, after such inspection, the contents of the packages should be restored to their original condition, and that the seal of the prize commissioners should be then placed on the place of storage of the cargo.

The report of the three gentlemen appointed to make an inventory of the cargo was filed on the 2d of June, 1863. They annexed to their report an inventory of the whole of the cargo. Two of the commissioners (Messrs. Blunt and Elliott) state, in the report, "that a very large portion of the said cargo will be found, on an examination of the inventory aforesaid, to be particularly adapted to army use; that large numbers of the cases contain Blucher boots, which are known as army shoes; a number of cases contain cavalry boots, and are so labelled, samples of said labels being hereto annexed; that 192 bales of the said cargo consist of gray blankets, adapted to the use of an army, and are believed to be such as are used in the United States army; 95 casks contain horseshoes of a large size; 36 cases of a large size contain artillery harness, in sets for four horses, with two riding saddles attached to each set; there were also on board two hydraulic presses in pieces, adapted for cotton; that a considerable portion of said cargo consists of drugs, directed Burchard & Co., successors, Matamoras, Mex'o, in which, among an assorted lot of drugs, quinine, calomel, morphine, and chloroform an important portion." The report states that the cargo consisted of 1,520 cases, 110 trunks, 287 bales, 169 casks, 209 kegs, and 559 bundles of merchandise, 1,343 bundles of hoop iron, and 280 bundles or bars of steel or iron. Mr. Gerard, one of the commissioners, appended to the report a statement that he concurred in the inventory and description of the cargo, but differed from his colleagues as to that portion of their report which described certain of the cargo as being particularly adapted to the use of an army. The samples of labels referred to as annexed are two in number, and were taken from trunks forming part of the cargo. One of the labels has upon it the words, "100 army Bluchers," and the other the words, "36 cavalry boots." It appears, from the inventory of the cargo annexed to the report, that of the 4,477 cases, trunks, bales, casks, kegs, bundles, and bars which the report states to have been found on board, the commissioners opened and examined 842 cases, 43 bales, 114 kegs, 2,109 bundles, 23 casks, and 11 trunks, being in all 3,142 parcels; that among these were 20 cases of Blucher boots, 5 cases of Bluchers and gentlemen's boots, 66 cases of Wellington, Napoleon, police, cavalry, and army Blucher boots, 15 cases of army Blucher boots, 2 cases of full-length russet army boots, two cases of black and russet Bluchers, 3 packages of shoes and light Blucher boots, 1 bale of gray-mixed blankets, one bale of army or gray blankets, 9 bales of mixed and gray blankets, 1 bale of white blankets, 2 cases of artillery harness and chains, 2 packages of saddles and hardware, 2 packages of saddlery and quinine, 11 cases of drugs, 1 case of quinine, 2 cases of assorted drugs, 5 kegs of nails, 107 iron kegs of nails, 9 bags of horseshoe nails, 1 cask of horseshoes, 3 packages of saddlery hardware, 2 cases of buckles, 4 cases of hinges, screws, stocks, and dies, 3 casks of hardware, 3 cases of cast steel and files, 280 bundles or bars of steel or iron, 5 cases of planes, axes, &c., 6 packages of planes and hardware, 2 packages of saws and files, 6 packages of pickaxes and handles, axes and hatchets, 147 bundles of spades and shovels, 42 anvils, 60 blacksmiths' bellows, 1 cask of vices, 2 cases and 9 bundles of machinery, being an iron bed-plate, and iron piston-rod, and other articles for a press, 1,343 bundles of hoop-iron, 501 boxes of tin, 1 case of horse-brushes, 6 cases of red, white, and blue bunting, and 305 coils of rope.

A large number of papers were found on board of the Peterhoff at the time of her capture, and have been laid before the court. The affidavit of the prize master, taken according to the usual practice, on the delivery of the papers to the prize commissioners, states that the delivery of the papers to him was refused until after the arrival of the ves-

sel at Key West, where, under instructions from Admiral Bailey, he demanded, in writing, of the master and passengers on board, that the papers should be delivered to him, whereupon they were delivered. Those which are of any importance consist of three bills of health; a certificate from the Mexican vice-consul at London, certifying to the manifest of the cargo of the vessel; a certificate from Lloyd's; a clearance certificate from the custom-house at London; a manifest of the cargo; a receipt for light duties at Plymouth; a certificate of the registry of the vessel; a certified copy of such certificate of registry; the shipping articles of the vessel; a receipt for harbor dues at Falmouth; a large number of bills of lading, invoices, certificates made by the Mexican vice-consul in London as to the shipment of merchandise by the vessel, and insurance; bills of goods shipped by the vessel from London to Matamoras; sundry papers relating to a hydraulic press found on board of the vessel; various letters; a copy of a policy of insurance on the vessel; one log-book; and four cargo-books.

The first bill of health was given to the vessel at London, on the 7th of January, 1863, and speaks of her as bound from London to "St. Thomas and other places." The second bill of health was given to her at St. Thomas, on the 24th of February, 1863, by the Danish authorities, and speaks of her voyage as one from London to Matamoras. The third bill of health was given to her at St. Thomas, on the same day, by the Mexican consul there, and speaks of her as bound to Matamoras.

The certificate of the Mexican vice-consul at London, as to the manifest of the cargo, is dated January 16, 1863, and certifies to the number of packages of merchandise composing the cargo as being 4,486, and as being consigned to Captain Jarman, at Matamoras, and speaks of the vessel as bound to Matamoras.

The certificate from Lloyd's is dated London, June 6, 1862, and certifies that the Peterhoff belongs to Hull, England, was launched in July, 1861, and is classed as A 1, for nine years from 1861.

The clearance certificate from the custom-house at London shows that the vessel cleared from London for Matamoras, January 6, 1863, and cleared a second time January 7, 1863.

The manifest of the cargo is signed by James I. Bennett & Wake, as brokers. It speaks of the vessel as clearing from London for Matamoras, January 7, 1863, and states the number of her bills of lading to be 38, and gives the marks and numbers upon all the packages composing her cargo. But under the printed head of "Description of Goods," it specifies only so many boxes, bales, cases, kegs, coils, packages, casks, bundles, chests, and trunks. The only description of any of the items is in the instances of 60 bellows, 120 bundles of spades and shovels, 42

anvils, 2 iron drums, 1,360 bundles of iron hoops, 280 bundles and bars of steel, and 9 bags of nails. The word "rope" has been written, in one instance, after the words "145 coils," and then carefully erased with ink. The items of "50 coils," "45 coils," and "20 coils," also occur in the manifest, with nothing written or erased thereafter. The entire cargo is stated, in the manifest, to be consigned to "order," except in the instance of 49 cases, 2 iron drums and 1 package, which are stated as being "addressed to Burchard & Co., successors, Matamoras," and as being consigned to "Messrs. Burchard & Co." the aggregate of the boxes, bales, cases, kegs, coils, packages, casks, bellows, bundles, anvils, chests, trunks, iron drums, bars, and bags is 4,581.

The receipt for light duties at Plymouth is dated January 19, 1863, and speaks of the voyage of the vessel as from London to Matamoras, via Plymouth.

The certificate of the registry of the vessel shows her to be a British-built vessel, built at Sunderland in the year 1862, and of the register tonnage of $669\frac{42}{100}$ tons, and is dated at the custom house, London, December 20, 1862. It states her to be wholly owned by Joseph Spence, of Cowper's Court, Cornhill, in the city of London, shipbuilder. The certified copy of said certificate of registry is dated at London, January 14, 1863.

The shipping articles of the vessel are dated January 1, 1863, and state her voyage to be "from London to Matamoras, and any port and ports in the Gulf of Mexico, and or or North and Sh. America, and West Indies, or or and back to a final port of discharge in the United Kingdom, voyage not to exceed twelve months." They state her crew to consist of a master, three mates, a carpenter, a steward, a cook, ten able-bodied seamen, two ordinary seamen, three engineers, eight firemen, and four able-bodied seamen as substitutes, those four substitutes being stated as having joined the vessel at Plymouth, three of them on the 13th of January, and one of them on the 15th, and all the others being stated as having joined the vessel at London, some on the 1st and some on the 2d of January, the crew thus consisting in all of thirty-four persons. The articles state that the seamen and firemen are to assist in the general duties of the ship, and to take in and discharge cargo, &c., when required by the master.

The receipt for harbor dues at Falmouth is dated January 19, 1863.

There were 72 bills of lading found on board of the Peterhoff. Of these 39 are originals, and the remainder are duplicates. Of 1 there are four sets, of 30 more there are duplicates, and of 8 there are no duplicates. Of the 39 bills, 9 are indorsed in blank, 9 are not indorsed, (8 of these 9 being the 8 of which there are no duplicates, and the remaining 1 of them being one for articles shipped by Captain Jarman,) 9 are indorsed

to Robert Bowden, 4 to G. W. Almond, 3 to Captain Jarman, 2 to S. J. Redgate, 2 to S. J. Redgate & Co., and 1 to S. J. Redgate and G. W. Almond. G. & W. Almond are named as shippers in 3 of the bills, James I. Bennett & Wake in 1, S. J. Redgate in 2, J. Spence in 2, Captain Jarman in 1, and sundry other persons in the rest. The bills of lading, both originals and duplicates, are all of them signed by Captain Jarman, and all of them specify that the goods are to be delivered to "order," except one covering 52 packages, which specifies that the goods covered by it are to be delivered to "Messrs. Burchard & Co., successors, Matamoras." Each of them speaks of the vessel as being "bound for off the Rio Grande, Gulf of Mexico, for Matamoras;" and each of them contains the following language: "Goods to be taken from alongside of the ship, at the mouth of the Rio Grande, at consignee's risk and expense, within thirty days of arrival, providing lighters can cross the bar, or a penalty will be incurred of ten pounds per day after that period." Each of them states that the goods are to be delivered "at the aforesaid off the Rio Grande, Gulf of Mexico, for Matamoras." In some cases the bill specifies that the freight is to be paid in London, and in other cases "at Matamoras." None of the bills of lading in any way specify what the articles covered by them are, except in the instances of a bill of lading of a shipment by James I. Bennett & Wake, which specifies 9 bundles of bagging, (this being the bill of lading that is not mentioned in the manifest,) and of other bills which specify 145 coils of rope, 50 coils of rope, 280 bundles and bars of wrought steel, 2 cases of seeds, 78 kegs of nails, and 1,360 bundles of iron hoops, 500 boxes of tin, 10 bales of gunny cloth, and 13 bales of cotton wrapping, 1,680 pairs of boots, 2 iron drums, 1,080 pairs of blankets, "11 packages hydraulic press," 45 coils of rope, 60 smiths' bellows, 147 bundles of spades and shovels, and 42 anvils, "3 cases medicines," and 9 bags of nails and 20 coils of rope.

A comparison of the inventory annexed to the commissioner's report of the cargo with the bills of lading, in respect to the marks and numbers upon the various packages, shows the following results: In packages covered by a bill of lading indorsed to S. J. Redgate & Co. were found saddles and hardware, horse brushes, hardware, saddlery, and quinine, and cast steel and files; in packages covered by a bill of lading indorsed to S. J. Redgate were found 145 coils of rope; in packages covered by bills of lading indorsed to Robert Bowden were found Blucher boots, Wellington, Napoleon, cavalry, and army Blucher boots, black and russet Bluchers, gray mixed blankets, and red, white, and blue bunting; in packages covered by bills of lading indorsed to Captain Jarman were found 70 coils of rope, mixed and gray blankets, and assorted drugs; in packages covered by

bills of lading indorsed to George W. Almond were found white blankets, light Blucher boots, Blucher boots, saddlery, hardware, bundles and bars of steel to the number of 280, 9 robes of bagging, horseshoes and horseshoe nails; and in packages covered by a bill of lading indorsed to Samuel J. Redgate and George W. Almond were found tin, being 501 boxes. Bills of lading not indorsed, and of which there were no duplicates, cover packages containing Blucher boots, planes, axes, &c., nails, artillery harness, buckles, artillery harness and chains, army Blucher boots, drugs, quinine, and army or gray blankets. Bills of lading indorsed in blank cover packages containing 23 rolls of bagging, (those packages being marked "Peterhoff, owner,") 90 coils of rope, hinges, screws, stocks, and dies, iron kegs of nails, saws and files, pickaxes and handles, axes and hatchets, spades and shovels, 42 anvils, 60 blacksmiths' bellows, vices, planes and hardware, 11 cases of machinery, containing the iron bed-plate, iron piston-rod, and other articles for a press, (J. Spence being the shipper of these 11 cases,) rolls of zinc, iron kegs of nails, and the 1,343 bundles of hoop-iron.

A large number of invoices were found on board of the Peterhoff, covering the entire cargo embraced in the 39 bills of lading, (in which bills 26 shippers are named,) except the articles specified in the inventory before mentioned as artillery harness, buckles, and artillery harness and chains, and the articles contained in packages addressed "Burchard & Co., successors, Matamoras," specified in such inventory as drugs and quinine, and the nine rolls of bagging. An examination of these invoices shows that among the articles covered by the bills of lading indorsed to Almond were 9 tons of horseshoes, 52,000 horseshoe nails, 644 bars of cast steel, 20 coils of Manilla rope, 2,000 pairs of gray blankets, 7,128 pairs of Bluchers, 99 waist belts, 14 ball bags, and a large number of buckles, martingale rings, harness awls, saddlers' knives, saddlers' punches, straps, and horse brushes; that among the articles covered by the bills of lading indorsed to Bowden were 379 yards of blue military cloth and blue military serge, 500 pairs of brown-gray blankets, 700 pairs of Blucher boots, 650 pairs of men's Bluchers, 472 pairs of Bluchers, 144 pairs of Wellington boots, 76 pairs of riding boots, 200 pairs of negro brogans, and 307 pieces of scarlet, white, and blue bunting; that among the articles covered by the bills of lading indorsed to Redgate & Co. were 200 ounces of quinine, 1,813 pounds of cast steel, 14 riding saddles, 22 bridles, 4 saddle cloths, and a large quantity of halter chains, harness buckles, martingale rings, buckles, trace chains, files, and axes; that among the articles covered by the bills of lading indorsed to Redgate were 145 coils of Manilla rope, weighing 5 tons; that among the articles covered by the bill of lading indorsed to Redgate and Almond were 500 boxes of tin plates;

that among the articles covered by the bills of lading indorsed to Captain Jarman were 2,000 pairs of "government regulation gray blankets." 50 coils of Manilla rope, weighing 11,411 pounds, 140 ounces of quinine, 20 pounds of chloroform, and a quantity of morphine, James's powders, Dover's powders, opium, and ipecac; that among the articles covered by the bills of lading indorsed in blank were 14 tons of sheet zinc, 72 iron kegs of nails, containing 7,728 pounds, 1,360 bundles of hoop iron, weighing 34 tons, 1,559 yards of gunny cloth, and 1,988 yards of stout cotton wrapping, the packages containing the last two articles being marked "Peterhoff, owner," and the invoice of them being headed "Adventure to Matamoras, per S. S. Peterhoff, to Pile, Spence & Co., Dr.;" that among the articles shipped by J. Spence and covered by bills of lading indorsed in blank were a large quantity of hatchets, axes, hammers, spades, shovels, planes, augers, gimlets, sledge-hammers, drawing-knives, saws, smiths' bellows, anvils, vices, pickaxes, files, and chisels, 90 coils of tarred hemp rope, weighing 11,384 pounds, and a cotton press, the invoice covering the last two articles being headed "Adventure to Matamoras, per S. S. Peterhoff, to Pile, Spence & Co., Dr.;" that among the articles covered by the bills of lading which are not indorsed, and of which there are no duplicates, were 1,000 pairs of "men's army Bluchers," 1,840 pairs of men's Bluchers, 1,160 pairs of other Bluchers, 1,500 pairs of Blucher boots, 180 pairs of long artillery boots, 1,080 pairs of brown-gray blankets, and 100 kegs of nails, weighing 10,000 pounds. The articles specified in the inventory of the commissioners before mentioned as artillery harness, buckles, and artillery harness and chains, and the articles contained in the packages addressed "Burchard & Co., successors, Matamoras," and specified in such inventory as drugs and quinine, (of all of which articles there are no invoices,) were covered by bills of lading which are not indorsed, and of which there are no duplicates. The nine rolls of bagging (of which there is no invoice) were covered by the bill of lading in which James I. Bennett & Wake are the shippers, and which is indorsed to Almond. The invoices also show that the other goods covered by the bills of lading indorsed to Almond consisted of hose, shirts, pantaloons, collars, braces, pins, needles, shoes, boots, sheepskins, chamois skins, buttons, felt hats, prints, flannels, blankets, dry goods, drills, shirting, sewing cotton, lace, spool cotton, tape, braid, sewing thread, awls, shoe pegs, linen thread, combs, and padding; that the other goods covered by the bills of lading indorsed to Bowden consisted of shoes, boots, leather, hose, vests, woolen gloves, skirts, sleeves, jackets, woolen shirts, cotton shirts, scarfs, neck-ties, pantaloons, frocks, cravats, mittens, cuffs, cloths, coats, sacks, cassimeres, dress goods, silks, and shawls; that the other goods covered by the bills of lading indorsed to

Redgate & Co. consisted of curry-combs, carriage bolts, padlocks, hinges, plane-irons, brushes, compasses, saws, locks, gimlets, chisels, dress goods, shirts, hose, felt hats, tea cloths, knives, and forks; that the other goods covered by the bills of lading indorsed to Redgate consisted of preserved meats and soups; that the other goods covered by the bills of lading indorsed to Captain Jarman, consisted of flannels; that there were on board goods covered by a bill of lading not indorsed, and in which Captain Jarman was named as the shipper, consisting of shoes, boots, writing paper, pencils, pens, combs, brushes, perfumery, soap, hose, shirts, worsted, spool cotton, pins, needles, buttons, gloves, headdresses, collars, handkerchiefs, and umbrellas; that the other goods covered by the bills of lading indorsed in blank, and in which J. Spence was the shipper, consisted of screws, locks, padlocks, hinges, butts, nails, rivets, spikes, and bits; that there were on board goods covered by bills of lading indorsed in blank, and in which Redgate was the shipper, consisting of vests, scarfs, shirting, shoes, ties, braces, collars, shirts, drawers, belts, hats, flannel, muslin, cloths, prints, boots and shoes; that the other goods covered by the bills of lading indorsed in blank consisted of garden seeds, cloths, and hats; and that the other goods covered by the bills of lading not indorsed, and of which there were no duplicates, consisted of planes, ploughs, axes, cloths, dress goods, shoes, hose, writing paper, and envelopes.

In announcing my decision in this case, at the time the decree was entered, I stated that I should prepare an opinion in the case at a future day. I now find that, on the 19th of November, 1863, a report of the prize commissioners was filed setting forth, in pursuance of the final decree of the 1st of August, 1863, a detailed inventory of the contents and value of the cargo of the Peterhoff, made under their direction. It appears from that report of November 19, 1863, that the articles specified in the report of June 2, 1863, as artillery harness, consisted of ten complete sets of russet artillery harness for four horses; that the articles specified in the report of June 2, 1863, as buckles, consisted of 553 gross of rings and 705 gross of buckles for harness; that the articles specified in the report of June 2, 1863, as artillery harness and chains, consisted of 20 complete sets of russet artillery harness for four horses, and 258 heavy russet artillery halters and 600 galvanized halter chains; that the articles specified in the report of June 2, 1863, as marked "Burchard & Co., successors, Matamoras," and as consisting of drugs and quinine, were 2,300 ounces of quinine, 245 pounds of chloroform, 1,000 pounds of calomel, and a quantity of opium, morphine, ether, and other drugs; and that the 9 rolls of bagging, specified in the report of June 2, 1863, consisted of 1,145 yards of bagging. The report of November 19, 1863, also shows that the packages on board,

marked "Burchard & Co., successors," contained, besides the said drugs, tea, garden seeds, dry goods, and blankets. Only one invoice was found on board of any of the articles contained in the packages marked "Burchard & Co., successors." That invoice is annexed to the report of June 2, 1863.

An examination of the report of November 19, 1863, shows that the articles covered by the bills of lading indorsed to Almond, were valued by the prize commissioners at $55,238.98; those covered by the bills of lading indorsed to Redgate & Co., at $7,082.53; those covered by the bills of lading indorsed to Redgate, at $1,875.30; those covered by the bill of lading indorsed to Redgate and Almond, at $5.010; those covered by the bills of lading indorsed to Bowden, at $113,130.77; those covered by the bills of lading indorsed to Captain Jarman, at $12.380.65; those covered by the bills of lading indorsed in blank, at $29,729.61, (of which $8,725.84 was the value of the shipments by Redgate, and $10,568.06 the value of the shipments by J. Spence;) those covered by the bills of lading not indorsed, and of which there were no duplicates, at $29,945.72; and those shipped by Captain Jarman, and covered by a bill of lading not indorsed, at $2,551.81.

Among the documents found on board of the Peterhoff was a copy of a letter, dated London, October 27, 1863, signed "James I. Bennett & Wake," and addressed to Messrs. Pile, Spence & Co.; and a copy of a reply to that letter, dated the same day, signed "Pile, Spence & Co.," and addressed to Messrs. James I. Bennett & Wake; and a copy of a letter dated London, January 17, 1863, signed "James I. Bennett & Wake," and addressed to Messrs. Pile, Spence & Co. These three letters relate to the voyage of the Peterhoff, and the respective interests of the writers of the letters in the freight to be earned by her, and show that she was to bring home a cargo of cotton from the Rio Grande. I shall have occasion hereafter to refer particularly to the contents of these letters. They constitute the only agreement, in the nature of a charter-party of the vessel, that was found on board.

There was also found on board a printed form of a policy of insurance, in which the names of "Robinson & Fleming, No. 21 Austin Friars, London," are printed as insurers. The blanks for writing in the form, are filled in as insuring the Peterhoff for £10,000 on her hull, and for $5,000 on her machinery, average payable on each valuation, as if separately insured, or on the whole, and general average, as per foreign statement, if required by the assured," "from London to Matamoras, while there, and thence to Liverpool; including collision clause, as per printed slip annexed," at the rate of five guineas per cent. On the margin of the form are printed the words, "Warranted free from capture, seizure, detention, and all consequences of hostilities." There is no signature to the instrument, although it contains the following in print: "In witness whereof, we the assurers, have subscribed our names, and sums assured. in London." The printed form of a bill at the foot of the copy of the policy, intended to be filled up with items of the charges for the premium and the policy, is not filled up.

There was also found on board a letter, dated "Royal Mail Steam Packet Company, No. 55 Moorgate street, London, January 8, 1863," signed "Rd. T. Reep, Sec'y," and addressed to "Capt'n Cooper, R. N., Jamaica," which says: "This letter will be shown to you by Capt'n S. Jarman, of the screw steamship Peterhoff, who, in the event of his not being able to procure a supply of coal necessary for his ship from merchants in your port, is to be accommodated from the company's stock under your charge, of, say, not exceeding 250 tons at 34s. 4d. per ton, either on his out or home voyage, both or either. You will be good enough in such case, to take the captain's drafts, at three days' sight, payable in London, on his owners, Messrs. Pile, Spence & Co., and forward the same to 55 Moorgate street, at your earliest convenience."

One of the papers found on board was a bill or invoice, reading thus: "London, 30 Dec., 1862. Messrs. Pile, Spence & Co., per Peterhoff, bot. of Ford, Curtis & Curtis, 10 bales gunny cloth, 1,559 yards; 13 bales stout cotton wrapping, 1,998 yds.; freight, £47 4s. 6d., marked 'Peterhoff, owner.'" On the same page with that bill is another, reading thus: "Manchester, Dec. 24, 1862. Messrs. Pile, Spence & Co., bot. of J. Bowes, 1 hydraulic cotton press, with ram to lift 4 feet, and set of pumps complete; 2 birch railway boxes, bound with iron, and fitted up with wheels, stillages, rails, &c." There was also found on board sundry correspondence in reference to this cotton press, and some drawings of cotton presses, to which I shall refer hereafter more particularly.

The cargo-books, four in number, give, under different headings, the dates of putting the packages on board, their marks and numbers, and solid contents and positions in the vessel. They are generally stated to be merely cases, bales, casks, and trunks, the contents not being specified, except in the instances of bellows, coils of rope, machinery, round bars in a bundle, bars of iron, machinery bars, packages of leather, medical comforts, samples, shovels, box for cotton press, iron hoops, anvils, casks of nails, bars and bundles of wrought steel, kegs of nails, and bags of nails. The log-book purports, on its title page, to be for a voyage from London to Matamoras, and to have been kept by H. Bound. It commences on the 30th of November, 1862, and details a voyage of the vessel from Liverpool to London, she having left Liverpool on that day, and arrived at London on the 6th of December following. The log shows that she remained lying at

London from the 6th of December until the 7th of January following, and that during that time, she was scraped, cleaned, and painted, and her decks caulked; that she commenced taking in cargo on the 24th of December, and finished taking it in on the 7th of January following; that she left London on the 7th of January. and arrived in Plymouth Sound on the 9th of January, in the evening; that on the 10th of January she proceeded further up the Sound, and took in fuel; that she left Plymouth harbor on the 18th of January, in the morning, and came to anchor in Falmouth harbor on the 19th of January, in the morning; that she left Falmouth harbor and proceeded on her voyage on the 27th of January, in the afternoon; that on the 20th of February, at 3 a. m.. she sighted the Virgin Islands, and at 8 a. m. was brought to by the "Federal war steamer Alabama" firing two shots across her bows, and at 8:15 a. m. was boarded by a "Federal officer," and had her papers overhauled, and at 8:45 a. m. proceeded towards St. Thomas, and at 9:45 a. m. came to anchor in the harbor of St. Thomas; that she remained at St. Thomas, where she took in coal. until the 25th of February, three-quarters of an hour after noon, when she proceeded out of the harbor; that at 2:20 p. m. she was brought to by the United States steamer Vanderbilt; that at 2:30 p. m. an officer came on board; that at 2:55 p. m. the officer, having overhauled her papers, left and returned on board the Vanderbilt, demanding that the Peterhoff should remain stationary; that at 3:30 p. m. the officer returned on board and demanded that Captain Jarman should take his papers on board of the Vanderbilt, which he refused to do, being in charge of her majesty's mails; that the officer then left, threatening to send an armed crew on board; that at 4 p. m. she was boarded by a lieutenant, a master's mate, an engineer, and 21 armed men from the Vanderbilt. who took charge of her against the protests of the captain and passengers; that at 8:50 p. m. she was boarded again by another officer. who demanded her papers to take on board the Vanderbilt, "which was refused, at the same time full liberty being given by Captain Jarman for the papers to be overhauled on board. or the ship searched"; that at 9 p. m. a lieutenant, a master's mate, two engineers, and an extra file of marines, &c., "took charge of the Peterhoff, telling Captain Jarman that he was not to consider himself any longer in charge"; that all the crew of the Peterhoff were then taken on board of the Vanderbilt, with the exception of the master, chief officer, second engineer, steward. cook, one boy, and the passengers; that on the next day, the 26th of February, the Peterhoff proceeded to the westward, and, passing within sight of St. Domingo and Jamaica. came to anchor in the harbor of Key West on the 7th of March, in the afternoon. The log-book ends on the 9th of

March, while the vessel was lying at Key West.

I will now refer to the most material portions of the depositions taken in preparatorio:

Captain Jarman says that the Peterhoff was seized on the 25th of February, 1863, off the harbor of St. Thomas, and taken thence to Key West, and from thence to New York, and that he does not know why she was seized. Bound, the first officer, testifies to the same effect. Harris, the second mate, says that the capture was made off the island of St. Thomas, three or four miles from the shore, and that he believes the vessel was seized on suspicion. Tregidgo, the third officer, says that the capture was made about four miles off St. Thomas, and that the vessel was taken on suspicion of an intention to run the blockade. Bowden, one of the passengers, says that Matamoras, Mexico, was to have been his home, and that he heard that the vessel was captured because they said she was going to run the blockade. Almond, one of the passengers, says that the capture was made about two or three miles outside of the harbor of St. Thomas, and that no reason was given for the seizure, unless on account of some alleged informality in the papers of the vessel. Redgate, one of the passengers, says that he was born in London, and resides in Matamoras, Mexico, and has resided there a year and a half or two years, and believes that his family are in Matamoras; that they were there with him a part of the time while he resided there, and, when not with him, were in the state of Texas. He also says: "I am a citizen of the United States. I now owe allegiance to the United States. I owe obedience to the laws of Mexico, but I owe allegiance at present to the United States government." The testimony of Redgate on this subject read originally thus: "I was once a citizen of the United States, and I suppose I am now. I now owe allegiance to Mexico, as a resident of Mexico. I think I do not owe allegiance at present to the United States." This testimony, as the record shows, was corrected by Mr. Redgate, on its being read over to him, by erasure and interlineation, so as to read as first above stated. He says that he understood that the reason the capture was made was, that the master of the Peterhoff refused to be taken out of his ship with his papers. Murphy, chief engineer, says that the Peterhoff was taken on suspicion of running the blockade. Murphy, first assistant engineer, says that the vessel was seized about seven miles outside of the harbor of St. Thomas, and that he does not know the reason of her seizure, except the pretence that she was intending to run the blockade. Webber, the steward, Duffay, a fireman, Diamond, the cook, and Campbell, a seaman, all say that they do not know why the vessel was seized. Reed, a seaman, says that he should think the capture was made five or six miles off the mouth of the harbor of St. Thom-

as; that he does not know why the vessel was seized; that he supposes it was on suspicion that she had contraband goods for the "Confederate government." Captain Jarman says that the Peterhoff sailed under British colors, and had no other national colors on board. The testimony of all witnesses is to the same effect. Captain Jarman says that the vessel was owned by J. Spence, of London, and that he was appointed to the command by Mr. Joseph Spence, the owner, in London; that he has known the Peterhoff since about the 10th of December, 1862; and that she was delivered to him by Mr. Spence, in London. Tregidgo says that he has known the Peterhoff since the 18th of October, 1862, when he first saw her coming into Liverpool on her last voyage from Nassau. Reed says that there was no resistance made to the capture, "only the captain would not allow his papers to go out of the ship."

Captain Jarman says that he had a small speculation of his own on board the Peterhoff, "a few stores and other property, as captains usually have"; that he had no interest in the vessel; that he had no other interest in the cargo; that his property paid no freight, and had nothing to do with the ship's cargo; that none of the ship's company had any interest in the vessel or the ship's cargo; and that the value of his property on board was about £1,000, at what it cost in London and St. Thomas. Bowden says that he was a passenger on board at the time of the capture, and held bills of lading for a part of the cargo; that he does not know who owned the remainder thereof; and that the value of his share of the shipment was between twenty and twenty-five thousand pounds sterling at London. Almond says that he owned in his own right a portion of the cargo on board the vessel, which, at cost prices, was valued at about twelve thousand pounds sterling; that this portion of the cargo consisted of men's and women's boots and shoes, calicoes, cotton, prints, shirts, flannels, woolen hose, horseshoes, and nails, felt hats, "not military, but civilian's hats," pins, and needles, one case of saddlers' tools and some shoemakers' tools; that he does not remember the names of any other articles; that what he had was a general assortment; that he had no arms, powder, shot, or any military arms or clothing on board the vessel, except one rifle and five revolvers, and some two or three hundred rounds of ammunition, which was all contained in a small tin box; that two of the revolvers were intended for the use of Redgate, and the rest for his own use; that he had also a small case of quinine, containing one hundred ounces, and a small portmanteau, also containing medicines and drugs in small quantities; that he intended to sell the same; that the portion of the cargo that he owned was entirely distinct and separate from the other cargo on board, and that the only other persons in any way interested therein were his father, his uncle, and himself;

that his father, William Almond, and his uncle, George Almond, both reside in London, and are partners together in the shipping business there, under the firm name of George & William Almond; that he is not interested in the firm, but shares with them equally in the profits resulting from the sale of the portion of the cargo owned by all of them; that he furnished no money to purchase the goods in question, but they were purchased by his uncle and father; and that no other person on board of the vessel has any control or power over the goods in question but himself. Redgate says that he was on board as a passenger; that he had an interest in some of the cargo, and that a large portion of the cargo was also consigned to him; that he supposes he had an interest in the cargo to the amount of from fifteen to twenty thousand pounds sterling; and that this includes what was consigned to him. Reed says that the captain took on board some of the cargo at St. Thomas. Captain Jarman says that the vessel was bound to the port of Matamoras; that the voyage began at London, and was to have ended in England, at Liverpool or London; that she carried a general cargo of merchandise, which was put on board in December, 1862, and January, 1863; and that she had no goods which he considers contraband of war. Bound says that the vessel was bound to Matamoras when captured; that the cargo consisted of assorted goods, partly of nails, iron, drugs, tin, and general cases of merchandise; and that he knows of no contraband goods on board. Harris says that they were bound to Matamoras; that the cargo was a largely assorted cargo of merchandise, in cases, bales, and trunks; and that he does not know of what it consisted. Tregidgo says that the vessel was bound to Matamoras; that she carried a general assorted cargo, and took in about ninety or one hundred cases of spirits at St. Thomas; and that there were some contraband goods on board, such as boots and shoes, and army cloth and medicines. Bowden says that the voyage commenced at London, in January, 1863; thence to Plymouth, for passengers, thence to Falmouth, under stress of weather; that the vessel sailed from Falmouth, on the 27th of January, for Matamoras, with liberty to call at St. Thomas or Jamaica for coal or other purposes connected with the voyage; that she stopped at St. Thomas from the 20th to the 25th of February; that, on the morning of the 25th of February, previous to entering St. Thomas, she was overhauled by the United States Steamer Alabama, and her papers were examined and passed; that she was bound for Matamoras, and was to return from that place to England; that when she left England, she had a cargo of general merchandise, consisting of boots and shoes, blankets and hosiery; and that he has heard there were also printed calicoes, nails, and other articles of that kind on board; that there were no goods contraband of war or

prohibited by law, to the best of his knowledge and belief; and that some articles, which he thinks were ships' stores, were taken on at St. Thomas. Almond says that the vessel left London, bound for Matamoras, to stop at St. Thomas, for coals; that she had nothing on board contraband of war or prohibited by law, to his knowledge; that, after leaving London, she stopped at Plymouth, and he went on board there; that she lay there some seven or eight days; and left Plymouth on or about January 20, and had to put back to Falmouth on account of contrary winds, where she remained until the 27th of January, when she proceeded to St. Thomas, arriving there about February 20, and there coaled; and that she remained there till the 25th of February, and left there about twelve and a half o'clock p. m. of that day, and was followed out by the Vanderbilt and captured about two p. m., although possession by the prize crew was not taken until about nine and a half p. m. Redgate says that the vessel was bound to Matamoras, and was cleared for that port, and that he obtained certificates from the Mexican consul to his bills of lading; that she had on board a cargo of general merchandise, consisting of woolen goods, fancy goods, boots and shoes, nails, tin, and cordage; that these are all he recollects; that he was there when she was taking in cargo and that she had no goods on board which were contraband of war, or otherwise prohibited by law. All the other witnesses, except Reed, say that the vessel was bound for Matamoras, and all except Duffay and Campbell, say that they know of no goods on board contraband of war. Murphy, chief engineer, says that there were some blacksmiths' tools and nails. Murphy, assistant engineer, says that the cargo was general merchandise. Webber says that there were some kegs of nails. Duffay says that he saw some smiths' anvils and bellows on board. Diamond says that she had an assorted cargo. Reed says that they were bound for Matamoras, or any port of North or South America; that the shipping master told this to him and to the greater part of the crew when they shipped in London; and that the cargo consisted of assorted goods.

Captain Jarman says that the vessel had the ordinary ship's papers only; that she sailed from London and touched at Plymouth and Falmouth in stress of weather, and at St. Thomas for coal; that her previous voyage, so far as he knows, was from England to Nassau and back to Liverpool; that on that voyage she must have had some cotton; and that she cleared from London on the 6th or 7th of January, and left Falmouth on the 27th of January. Harris says that they stopped at Plymouth to take on passengers. Trigidgo says that her previous voyage was to Nassau; that he does not know what she took out; and that she brought back cotton. Bowden says that he has heard that the vessel had made one voyage to Nassau. Almond says that the vessel had only carried one cargo before the present one; that that was a cargo of coals, which she delivered at Nassau, and returned to Liverpool with a cargo of cotton, which was put on board at Nassau; and that he heard this from Captain Jarman. Diamond says that the last voyage of the vessel was to Nassau and direct back to Liverpool, calling for coal at Halifax; that the last cargo was general, consisting of tea, coffee, liquors, &c., and was all sold and landed at Nassau; and that it was put on board at Liverpool, England, partly by a man named Dobson, in August, 1862. Captain Jarman says that the present cargo of the vessel is assorted, and consists of general merchandise; that he knows it consists of some kegs of nails, a little iron, cases and bales, which he supposes are dry goods, some large bellows, and a few anvils; and that he cannot specify any further. Bound says that the cargo was of general merchandise, but that he does not know particular quantities and qualities. Harris says that the cargo was a largely assorted general cargo, in cases, bales, trunks, &c., and that he does not know what was in them, nor anything about the different species or quantities of cargo. Tregidgo says that the cargo consisted of medicines, about five hundred boxes of tin plates, blacksmith's bellows and anvils, cotton presses, boots and shoes, bar iron, army clothing, kegs of nails, spades and shovels, carpenters' tools, spirits, some heavy casks, iron work, and bales and cases. Almond says that the portion of the cargo other than that in which he is interested consisted, as he understood, of a general assorted cargo of merchandise, of a kind and character similar to the portion in which he is interested. Redgate says that he cannot set forth the quantity or different species of the cargo more fully than he has done in his answers to previous interrogatories. The other witnesses, all of them, say either that the cargo was assorted merchandise or that they do not know of what it consisted. Captain Jarman says that the vessel was owned by Joseph Spence of London; that the cargo is owned by merchants in London, represented by three passengers who were on board; that he represents the owner's share of the cargo, that is, the share of Spence & Co.; that they have a share of not above one-eighth, he supposes; that he knows, by the bills of lading, who the owners are; that he thinks it is all represented by his three passengers and himself, except a few parcels or cases on board, which are covered by a bill of lading indorsed to Burchard & Co., of Matamoras; that they are all English owners, except the last named, and he does not know what countrymen they are; and that the English owners, he thinks, all reside in London, and he supposes they are all English subjects. Bowden says that he believes the entire cargo

was owned by the shippers, as they appear upon the bills of lading, or the parties in Matamoras, to whom they were consigned; that he held bills of lading for boots and shoes, hosiery, shirts, blankets, cloths, bunting, and other articles, from parties whose names he gives, and who, he says, were the owners of the goods, and are, as he believes, all British subjects, doing business in England; that he intended to do business in Matamoras as a commission merchant; and that these goods were consigned to him for sale. Almond says that Bennett and Wake were agents for the vessel. Redgate says that the goods on board were owned by a great many persons, the names of some of whom he gives; and that they all live in England. Captain Jarman says that there was a bill of sale of the vessel to J. Spence, which he saw the day he took charge of her; that he does not know who sold her; that he took a new register of her on or about the 10th or 12th of December, 1862; that this sale was made in London on or about that date; and that he thinks the sale was made by Mr. Pearson or Parsons. Tregidgo says that the vessel was bought by her present owners at a mortgagee's sale, which owners he states to be Messrs. Pile, Spence & Co.

Captain Jarman says that he thinks the names of the laders and owners of the cargo are all contained in the bills of lading which were found on board; that, so far as he knows, all the cargo is for the real account, risk, and benefit of those who appear in the bills of lading to be the owners. Bowden says that the goods were to be delivered at Matamoras, for the account, risk, and benefit of the shippers of the same. Almond says that the laders of the cargo in which he is interested were his father and uncle; that he and they had no consignees, as he was authorized to select his own consignee, on arriving at Matamoras; that this authority was verbal and not in writing; that these goods were to be delivered at Matamoras for the real account, risk, or benefit of his father, his uncle, and himself; that they all owned the same in equal shares; that it was his intention to settle in Matamoras and sell the goods in question himself; and that he had never been there. Redgate says that part of the cargo was consigned to him as a merchant in Matamoras for some eighteen months then past. Webber says that some cases were taken on board for the captain, at St. Thomas, some of which contained liquors. Captain Jarman says that he thinks there are five and twenty or thirty bills of lading; and that none were false or colorable, and none were different from those found on board at the time of the capture, to his knowledge. Almond says that three sets of bills of lading, consisting of four in each set, were signed for the cargo owned by himself and partners; that he gave up four bills of lading to the prize officer. Red-

gate says that he does not know exactly how many bills of lading were signed for the goods belonging to, or consigned to him, but he thinks seven or eight. Captain Jarman says that he has no other papers, and had none relating to the vessel and cargo, except what he delivered up at the time of the capture. Captain Jarman says that there was a charter-party, or a copy, on board with the papers at the time of the capture, signed by Spence, and Bennett & Wake. Bound says that the capture took place about three miles from St. Thomas, and that he thinks there was a charter-party signed. Harris says that the capture took place in sight of St. Thomas Island. Tregidgo says that the vessel was captured about four miles to the southward of St. Thomas. Almond says that the capture was made a few miles off the coast of St. Thomas. Murphy, first assistant engineer, says that the capture was made just outside the harbor of St. Thomas. Webber says that the vessel was captured near the harbor of St. Thomas. Captain Jarman says that the prize commissioners have all the papers that were on board the vessel at her last clearing port; that none connected with the voyage, the ship or the cargo were destroyed; that he tore up some letters from his wife and father at the time of the capture; that none others were destroyed, to his knowledge, by any person; and that none were concealed, or in any way disposed of, to his knowledge. Bound says that the ship had her usual papers, clearance, register, &c., all of which were on board when captured, and that none were destroyed or concealed in any way. Harris says that he does not know what papers were on board the vessel when she left London; and that he threw overboard, by order of the captain, a square paper package, the contents of which he does not know, about the time of the capture, after the first boarding by the officers of the Vanderbilt, and before the prize crew took possession, he thinks, but he cannot say precisely at what time. He says: "This paper package was handed me by the captain, or he told me to get it out of the cabin, which I did. While I had it in my possession, I handed it to Campbell, or some other seaman, and told him to hold it while I was busy, and he did. He afterwards gave it back to me, and I then threw it overboard. I told the seaman who held it that in case a boat from the Vanderbilt came alongside, not to let it be seen. The captain told me not to let any one see it. The captain had given me this same paper parcel once before, at the time the Alabama stopped us, before we were boarded by the Alabama. He told me, at that time, to keep this parcel, and throw it overboard if he told me to, or, if he made a sign to me, then to throw it over. As I did not throw it overboard then, I gave it back to the captain. The Alabama was a United States war steamer of some

kind, which boarded us before we went into St. Thomas, on the same day that we went into St. Thomas. I think this was four or five days before we were captured."

Tregidgo says: "I don't know what papers were on board of the steamer when she sailed, except the English mail for Matamoras. When we were first boarded by the Alabama, going into St. Thomas, the captain sent for the second officer, and gave him a packet, with instructions to keep it in the fore part of the ship, and if he, the captain, made him a sign, he was to throw the package overboard, and if the boarding officer was between the captain and the second officer, so that a sign could not be made, he was to use his own discretion. On the boarding officer returning to the Alabama, the packet was taken aft to the captain. On being first boarded from the Vanderbilt, exactly the same proceedings were carried out, and the packet was again returned to the captain. On the captain perceiving the officer again coming from the Vanderbilt, he gave me the packet, and told me to keep out of the way with it. He then said: 'Never mind. Fetch the second officer;' and the packet was again given to him—the second officer, Mr. Harris. On the captain observing a prize crew coming from the Vanderbilt, he called the second officer aft, and, after sending for Mr. Mohl, one of the passengers, to witness the necessity of throwing the packet overboard, he then ordered the second officer to throw it overboard from a part of the ship where it would not be observed from the Vanderbilt, which he did. While the packet was in the fore part of the vessel, a man named Campbell had it, concealing it. I do not know what the packet contained. I heard the captain speak of it as containing dispatches. He called it dispatches. There were some written papers sent to the stoker to be burned. They were burned by George Duffy, fireman. The packet was sewed up in canvas, and weighted with lead, so that it would sink. Mr. Mohl appeared very much depressed at the necessity of throwing over the packet." Bowden says that no papers of any kind were burned, thrown overboard, destroyed, cancelled, or attempted to be concealed, to the best of his knowledge, information or belief.

Almond says: "I don't know what papers were on board the vessel when she left St. Thomas. The same day we arrived at St. Thomas, Captain Jarman ordered a package to be destroyed. It was in charge of Mr. Mohl, passenger. He gave it up, at the captain's request, to be destroyed. I suppose it was destroyed. I don't know for what reason it was so destroyed. I don't know what the package contained. We were in sight of St. Thomas at the time. I don't remember whether or not it was destroyed before or after we were hailed by the United States steamer Alabama. We were hailed by that vessel the morning of the day we reached St. Thomas. We entered about half past ten o'clock in the morning. The package was very small. I never saw it but once, and then it was in Mr. Mohl's possession. I never knew what it contained. It was destroyed because Mr. Mohl objected to its being opened. At Falmouth, Captain Jarman said we must deliver up any and all sealed packages, as he should not carry any. Mr. Mohl had the one in question, but did not give it up at the time, and it was not given up until the morning of the day of our arrival at St. Thomas, when it was destroyed, as I have above stated. Nothing else was destroyed or concealed, to my knowledge."

Redgate says that he had no letters, and no instructions, as to the mode of disposing of the cargo; that he does not know that any person burned, tore, threw overboard, destroyed, or cancelled, or attempted to conceal, any papers on board. Murphy, assistant engineer, says that he, was told by the second steward that there were some papers destroyed by one of the stokers, named George Duffy; that some were thrown overboard by the second mate; and that the first steward, Webber, knew of the fact. Webber says: "I heard several of the crew say that some papers had been thrown overboard by Mr. Harris, the second mate, just before the Alabama boarded us. I saw some newspapers burned by Duffy, a fireman. They belonged to a passenger, named Mohl, who gave them to me to be burned, and I gave them to Duffy and told him to burn them. I don't know why he wanted them burned. I saw the packet that Mr. Harris was said to have thrown overboard. It looked like a brown paper parcel. I did not see him throw it over." Duffy says: "The steward of the ship gave me a package of papers, or something that was printed. It looked like a book that had been 'tossed from a great many hands.' He told me to burn it, which I did. I don't know the steward's name, nor the contents of the package or book which I burned, nor anything about it, except what I have stated. This was about the time the Vanderbilt captured us. I cannot say exactly whether it was before or after the capture. We were outside of the harbor of St. Thomas, after we had been in. I was down in the engine room, and as I came up on deck the steward gave me this package, and told me to burn it. He did not say why, nor who it belonged to, nor anything more than to burn it." Reed says: "When we first saw the United States gunboat, the Alabama, which boarded us on the 20th day of February, before we went into St. Thomas, the captain sent Mr. Harris, the second officer, forward with a box of papers, which papers I saw the captain put into the box, and he told Mr. Harris to put something into the box to sink it, and, on the raising of his finger, to let it go overboard (the

box and papers, I mean); but, as the officer did not search the ship, he took the box back again and gave it to the captain. When we sighted the Vanderbilt, the captain again told Mr. Harris, the second officer, to take the box forward again, and be sure to put something in it to sink it; and, after the first boat which boarded us from the Vanderbilt was returning to the Vanderbilt, the captain told Mr. Harris that if the boat from the Vanderbilt returned again to our ship, then to throw the box overboard, which Mr. Harris did. I saw it go overboard myself. He then sent the steward, Thomas Webber, with another bundle of papers, to George Duffay, the fireman, to be put into the furnace, which was done; and, when the steward returned, the captain gave him two papers to hide, and, in case the captain was taken out of the ship, then the steward was told to destroy them, and he made a motion with his fingers as if to tear them. This was in the pantry, and I was alongside of the steward at the time, and the captain was opposite to both of us. I do not know whether the steward did destroy them or not." Campbell says: "The second mate gave me a sealed parcel, wrapped in brown paper. He told me to take care of it, and, if I was signalled by either himself or the captain, I was to let them drop overboard. I was in the forward part of the ship. The boarding officer was at that time on board from the United States steamer Alabama. After the officer left I gave the parcel back to the second mate. Afterwards, when the prize crew came off from the Vanderbilt, I saw the second mate give the same parcel to the captain of the Peterhoff, and I saw the captain drop them overboard from the starboard gangway. The package was heavy, but I do not know what was in it."

Captain Jarman says that he knew of the blockade of the principal ports of Charleston, the Mississippi, &c., before he left England, and knew about the war in America. The testimony of all the witnesses is, that the officers, crew, and passengers knew of the war and of the blockade of the enemy's ports before leaving England. Captain Jarman says: "I was spoken and boarded by the United States ship Alabama on this voyage. My papers were examined, but my papers were not indorsed. I was allowed to proceed. I was spoken by the Alabama about two miles from St. John's Island, and seven from the harbor of St. Thomas, on the 20th of February last." Harris says that, on her previous voyage, the vessel was under another owner, Mr. Pearson, of Hull. Duffy says: "When I shipped, I refused to go if the vessel was to run the blockade. This question arose between the captain and me at the Sailor's Home, where I shipped. I told him I did not wish him to take me to run the blockade. He said it was more than he dare do, to run a blockade, as he belonged to the naval reserve."

Captain Jarman says that he has sustained considerable loss by the seizure; and that, in case his property should not be restored, he will sustain considerable loss. Bowden says that he has sustained a serious loss by the capture, in time and business, and in other respects. Almond says that he has sustained great loss by the capture. Redgate says: "I have sustained an injury by the seizure of this vessel. I compute my loss in this way—imprisonment on board of the vessel, loss of time, loss sustained in business, loss by being deprived of performing my duty as agent of Lloyd's at Matamoras, and for other wrongs and privations." Captain Jarman says that the vessel was insured, and he believes the cargo was. Bound says that the vessel was insured partly in London and Paris. Bowden says that the part of the cargo which he represented was insured or partially insured. Almond says that his portion of the cargo was insured for £11,500 in Lloyd's for the voyage from London to Matamoras, with liberty to stop at St. Thomas, or Jamaica; that the premium was under £5, and he thinks about 97s.; and that it was insured by his father and uncle with Bennett & Wake, brokers. Redgate says that the goods, as far as he was concerned, were insured; that he understands that the vessel was insured also; that the insurance was from London to Matamoras, touching at St. Thomas for coal; that he does not recollect at what premium; and that some of the insurances were effected in London and some in Paris. Captain Jarman says that if he had arrived at his destined port, the property would have become the property of the consignees—that is, for the time being; and that the property was represented by the passengers who were on board. He says that there was a small quantity of tea on board. Tregidgo says: "I heard Mr. Eyck, one of the passengers, say that the cargo was to go across the river, from Matamoras into Texas. I am very confident of this." Bowden says that, if they had arrived at Matamoras, the part of the cargo which he represented would have taken the chance of the market for its sale; and that the proceeds were to be returned. Almond says that, on arriving at Matamoras, he was to hold the cargo, and take his chance in the market for its sale. Redgate says that, if the vessel had arrived at Matamoras, the cargo would have belonged or would have been at the disposal of the persons holding the bills of lading, and that the laders or owners were to take the chance of the market. Captain Jarman says that he knows of no papers of any kind relating to the vessel and cargo in any country, except those delivered to the captain; and that no papers were delivered out of the vessel in any way whatever, to his knowledge. Bowden says that the prize master, at the time of the capture, took away all the papers relating to the vessel and cargo. Almond says that he does not know of any

other papers than those received by the prize officer. He says: "All the vessel's papers, and all the papers relating to the cargo, were delivered by Captain Jarman and by ourselves to the prize officer, Acting Master Lewis, of the Vanderbilt, on the day of capture. I delivered four bills of lading, set of invoices for the entire lot of my goods, and the Mexican consul's certificate of proper shipment of goods, to the officer. These were all the papers I had relating to the cargo." Redgate says: "There are not in any country besides the United States, nor on board of any vessel, any bills of lading, invoices, letters, instruments, papers, or documents relative to the vessel or cargo, that I am aware of; none that I know or heard of." He says: "There were no papers delivered out of, or carried away in any manner whatever from the vessel that I know of. I never heard that any had been, except those that were taken by the prize officer."

. Captain Jarman says: "There were eight passengers on board when I left London or Plymouth. Their names are as follows: Samuel or S. Redgate, Robert Bowden, Wellesly Almond, Mr. Mohl, Mr. Edwards, Mr. Heyck, Mr. Ellsworth. The last four left me while I was at Key West, having no interest in the cargo. One other left at Falmouth, he having joined the ship at Plymouth. The three first named are in charge of a large portion of the cargo, and are now here. They were taken on board in London or Plymouth, and were destined to Matamoras. None of the eight passengers were citizens of the United States, to my knowledge. Possibly Mr. Edwards may have been." Bound says: "Bowden, Almond, Redgate, Edwards, H. Heyck, Ellsworth, Moyles, were passengers on the vessel at the capture. Redgate, Edwards, Heyck, and Moyles are from Mexico; the others from England. All are merchants. They came on board at London and Plymouth. Bowden, Redgate, and Almond were, I think, interested in the cargo; the others not, I believe. They were all going to Matamoras. No citizen of the United States was on board nor any citizen of any of the states at war with the United States." Tregidgo says: "There were seven passengers on board. Their names were Bowden, Almond, Ellsworth, Eyck, Mohl, Edwards, Redgate. Mohl and Redgate told me they were residents of Texas. Eyck also belongs to Texas. He told me so. There was a Mr. Bisbie, who came on board in Plymouth, and left the ship at Falmouth. I think he was an army officer, as he had his sword with him. I think he was an American. The passengers were going to Matamoras. Edwards told me he must be back into the Southern states by the first of March." Bowden says: "There were seven passengers on board. All were bound from England to Matamoras. They were myself, Messrs. Redgate, Ellsworth, Mohl, Edwards, Heyck, and Almond." Almond says that there were seven passengers on

board, S. J. Redgate, R. Bowden, Mr. Ellsworth, Mr. Mohl, Mr. Edwards, Mr. Heyck, and himself; that Mr. Mohl and Mr. Heyck were Germans, as he believes; that the remainder were Englishmen, with the exception of Mr. Edwards, who told him he was an American; and that they were all bound to Matamoras. Redgate says that there were seven passengers on board, including himself, Bowden and Almond; that the others were Mr. Edwards, Mr. Heyck, Mr. Mowl, and Mr. Ellsworth; that he thinks Mr. Edwards was an American; that Mr. Mowl and Mr. Heyck were Germans, and Mr. Ellsworth a Scotchman, who was bound to Matamoras, as his (Redgate's) clerk; that they were young men; and that he does not know that they had any families. Webber says that there were seven or eight passengers on board when they left Plymouth: that one by the name of Bisby or Bigbee, left at Falmouth; that three or four left at Key West; that their names were Mr. Ellsworth, Mr. Heyck, Mr. Edwards, Mr. Mole. Reed says that there were seven passengers on board, and that one joined at Plymouth and left at Falmouth; that his name was Colonel Bigsby; that he was an officer in the Confederate army; that one of the passengers was Mr. Redgate, and the others Mr. Almond, Mr. Mole, Mr. Hyeck, Mr. Edwards, Mr. Ellsworth, Mr. Bowden; that they were all taken on board at Plymouth, except Mr. Hyeck and Mr. Ellsworth, who were taken on board at London; that they were going to Matamoras; that they said that from there they were going home; that they did not say where their home was, but that he heard them say that they could not get home because their place was blockaded; that Mr. Mole burned some papers when the Alabama boarded them; and that it was note paper, with the "Confederate flag" upon it.

Captain Jarman says that all the papers found on board are true and fair to the best of his knowledge and belief; that none are false or colorable, to the best of his knowledge; that there were no other papers of any kind, except as he has already stated; and that he has signed no papers concerning the vessel or cargo since her capture. Bowden says that all the papers found on board are true and fair, to the best of his belief; and that he had a passport for Matamoras, Mexico, through Earl Russell. Almond says that all the papers found on board are true and fair to the best of his knowledge; that he had a passport from the English government, viséd by the Mexican consul at London, to go to Mexico, and travel there, and has it now in his possession. Redgate says: "As far as concerns myself, all the papers which I had were entirely true and fair, and, as far as I know or believe, all of the other papers were so, and none of them were false or colorable, nor do I know of any matter or circumstance to affect their credit. I have not made any oath or affirmation in order to

obtain any passport or other clearance. I had no passport or letter of safe conduct. I do not know whether the others had or not. I have written letters to the British consul at Key West, and also to Lloyd's, giving an account of the capture. I have no copies of such letters." Captain Jarman says that he was steering, when captured, towards Matamoras; that his course was not altered upon the appearance of the capturing vessel; that the course of the Peterhoff was at all times directed towards her port of destination, as shown on her papers; and that her course was not altered at any time to any port or place, except to such ports as he had already stated. The testimony of all the other witnesses is to the same purport. Captain Jarman says that there were no arms or parts of arms, or warlike instruments of any kind on board, and no cargo of any kind, to his knowledge, except such as he had described, to the best of his knowledge, but the private arms of the officers and passengers, which were taken and kept by the captors. He also says that he has already stated all that he knows and believes relative to the true character and destination of the vessel and cargo. Bound says that there was a cotton-press on board, not put together. Bowden says that nothing was thrown overboard to prevent suspicion. Murphy, assistant engineer, says that the Peterhoff was sold to Pile, Spence & Co. by, he believes, Mr. Pearson, of Hull.

At the close of the deposition of Captain Jarman, as taken on the 1st of April, 1863, after the signature of the witness and the jurat of the prize commissioner, is a certificate signed by the commissioner, stating "that subsequent to the examination of the above deponent, circumstances having occurred which led him to suppose that deponent had not fully answered the 20th interrogatory, as to the destruction of papers in this case, and deponent having been voluntarily present before the commissioner, the 20th interrogatory was again read to deponent, and his answer thereto read to him, as herein recorded, and deponent was asked if he desired to add to or alter his answer to the above interrogatory, when deponent replied that he did not desire to change or add to his answer herein."

In the deposition of Tregidgo, after his answer to the 43d interrogatory, and before his signature to the deposition, and also before the jurat thereto, is the following statement: "The witness adds to his reply to the 20th interrogatory as follows: I have been a midshipman in the British navy, and am accustomed to seeing the form in which dispatches are made up. The packet thrown overboard was put up in the same manner. There was no mark upon it. The ends were loaded with a heavy weight of lead at each end. The first time that I ever saw it, or knew it was on board the ship, was when the Alabama boarded us. I then saw it, and saw

at once that it was a package of dispatches. This addition to my reply to the 20th interrogatory was made at my request. I was born in the year 1843, and am nearly 20 years of age." The deposition of Redgate was taken on the 1st of April, 1863. On the 20th of April, 1863, he was reproduced by the United States district attorney, and, at his request, re-examined. On such re-examination he testified as follows, in answer to the 1st interrogatory: "I resided in the state of Texas until the breaking out of the war between the Northern and Southern states. I had resided there about thirty years—twenty-five or thirty—and battled against secession as far as my humble means would allow, until I was driven out of the state. My family resided there with me, and, when I left Texas, I left my family there. They afterwards followed me into Matamoras. I never took the oath of allegiance to the republic of Texas, nor, since its admission, to the government of the United States. I never had any papers of citizenship, nor did I ever obtain a passport at any time." On such re-examination, he also testified as follows, in answer to the 9th interrogatory: "There was a small portion of the cargo on board which I owned absolutely. The bills of lading in these cases, which are among the papers, will show the portion which belonged to me absolutely, and so will the invoices which are with the papers. They are made out in my name. Other portions of the cargo were consigned to me, and the bills of lading in these cases are indorsed to me, and the invoices in these cases are made in the name of the consignors. My only interest in these cases was to arise from the commission on the sales, when made, of five per cent. I was not an owner, in any way, of the portion of the cargo which I now speak of as having been consigned to me. The portion of the cargo which I absolutely owned was very small, and cost me something like one hundred to one hundred and fifty pounds. Since the vessel arrived in this port, Mr. Bowden, another passenger with me, who was the agent or superintendent of a considerable portion of the cargo, has empowered me, by a power of attorney, to take care of and manage his interests in the cargo. I think the cargo in question, in which Mr. Bowden is interested, is shown by the bills of lading among the ship's papers, they being indorsed to him. Of this I am not positive, although I have very little doubt they are so indorsed, and that the names of the owners in this case, as in that portion consigned to me, appear in the invoices found on board. In all these cases in which I am interested as consignee, the names of the absolute owners appear in the invoices, to the best of my knowledge, and they all reside in London, Glasgow, and Nottingham, and are all English subjects."

At the close of the deposition of Thomas Webber, as taken on the 6th of April, 1863, after his signature and the jurat, is the following statement: "On reading the deposi-

tion over to deponent, he adds, in reply to the 20th interrogatory, that, after the Peterhoff had been boarded by either the Alabama or the Vanderbilt, the captain gave me a small package of papers on blue foolscap sheets, about two sheets, and told me that, if the ship was captured, I was to tear up and destroy these papers, but I handed the papers back to the captain several hours after, and did not destroy them." This statement is signed by the witness, and has to it a jurat, showing that it was sworn to on the 6th of April, 1863, the same day that his main deposition was sworn to.

On the 2d of May, 1863, an application was made to the court, on the part of Samuel J. Redgate, to allow special interrogatories to be settled by the court, to be propounded to him in preparatorio, so as to enable him "fully to explain his political status and loyalty to the government of the United States, and his conduct, motives, and intentions in relation thereto, and further to explain fully his connection with the cargo of the Peterhoff, and his motives and objects in connection with the voyage on which the said vessel was captured as prize." This application was founded upon an affidavit made by Redgate; but it was opposed by the district attorney and the counsel for the captors, and was refused by the court, on the ground that the question of the individual loyalty or disloyalty of Redgate was of no importance, and that his political status, upon the testimony given by him in his depositions in preparatorio, and upon the facts stated by him in his affidavit on the application, was that of an enemy, according to the decisions of the supreme court in Jecker v. Montgomery, 18 How. [59 U. S.] 110, and in the Prize Cases, 2 Black [67 U. S.] 635. Subsequently Mr. Redgate renewed his application to be examined on special interrogatories, protesting against his being regarded in any respect as a citizen of "the so-called Confederate government," averring that he was an alien enemy to it, and claiming a right "to so place himself before the court, by proofs in preparatorio," as to put himself in the attitude of a neutral, for the purposes of a just protection to his rights. On the 11th of May, 1863, on this application, with the consent of the district attorney and of the counsel for the claimants, the court made an order that Redgate be forthwith examined orally before the prize commissioners; that the interrogatories and his answers be reduced to writing by them, and submitted to the court; and that the district attorney and the proctors for the claimants be allowed to be present, and to put direct and cross interrogatories to him. No examination of Mr. Redgate, under this order, appears ever to have taken place. The court has been informally advised that the examination of Mr. Redgate under this order was waived by consent of the district attorney and of the counsel for the claimants. No prejudice, therefore, can attach to Mr. Redgate, because he was not examined under this order.

On the 27th of April, 1863, Captain Jarman made an affidavit, containing a statement in respect to the package which the passenger Mohl had in his possession, and which was thrown overboard by Harris, by direction of Captain Jarman, after the Peterhoff was boarded by a boat from the Vanderbilt. That statement was, in substance, the same as the one subsequently made by Captain Jarman on his further examination, which will be alluded to hereafter, and the general purport of it was that the package in question was a package which Mohl told Captain Jarman contained "white powder," but of the contents of which Captain Jarman was ignorant, and which he ordered to be thrown overboard, because he thought it would "endanger or compromise" his vessel; and that he did not believe that it contained anything other than powder of some kind. He further stated in his affidavit: That the twentieth standing interrogatory was, on his examination, put to him as follows: "What papers, bills of lading, letters, or other writings relating to the vessel or cargo were on board the vessel at the time she took her departure from her last clearing port before she was taken as a prize? Were any of them burned, torn, thrown overboard, destroyed, or cancelled, or attempted to be concealed, and when and by whom, and who was then present?" That, believing that the contents of the package were only powder, he made answer as follows: "You have all the papers which were on board at her last clearing port; none connected with the voyage, the ship, or the cargo were destroyed. I tore up some letters from my wife and father at the time of capture. None others were destroyed, to my knowledge, by any person. None were concealed or in any way disposed of, to my knowledge." That Mr. Elliott, the commissioner, asked to call in a day or two, as he might wish to see him again. That, in pursuance of such invitation, he called a few days afterwards at the office of the commissioner. That the commissioner called his attention to the foregoing interrogatory, and the answer thereto, and asked him if he clearly understood the interrogatory. That he then told the commissioner about the said package in terms substantially the same as contained in the affidavit, and inquired of the commissioner if it would not be a proper matter to explain in connection with his answer to the interrogatory; and that the commissioner informed him that he did not think that it was at all pertinent to the interrogatory, and that his answer to the interrogatory was in every way sufficient. On this affidavit an application was made to the court, on the part of the claimants, that Captain Jarman be allowed to add to his answer to the twentieth interrogatory the statement contained in his affidavit. On the hearing of the application, an affidavit made by Mr. Elliott, the prize commissioner, was

presented to the court, stating that the request made by him to Captain Jarman, at the close of his examination, to call, was designed as a civility merely, and was an invitation rather than a request; that he subsequently sent for Captain Jarman, and with the purpose of allowing him to explain his answer to the twentieth interrogatory; that, at the interview which followed, Captain Jarman told him the history of the package, substantially as detailed in his affidavit, though perhaps not so much in detail, but that Captain Jarman thought that, as the twentieth interrogatory asked only in respect to papers, there was no occasion to change the answer, and said that he thought his answer was sufficient; and that he, the commissioner, did not express any opinion on the subject, but simply acquiesced in the opinion of Captain Jarman. It appeared that the original examination of Captain Jarman had been completed and reduced to writing, and sworn to by the witness on the 1st of April, 1863, and that the report of the testimony of Captain Jarman and of all the other witnesses had been filed on the 21st of April, 1863, and an order granted on that day by the court that all the proofs be opened. The application thus made on the part of the claimants was opposed on the part of the libellants. In deciding upon that application I came to the conclusion that it did not appear that Captain Jarman was aware, at the time of his interview with the commissioner subsequently to his examination, that his testimony had been formally closed; that there was room for a fair implication, that he was invited by the commissioner at that interview to review his answer to the 20th interrogatory, and offer further statements in reply to it; and that he might have supposed that his oral statements to the commissioner at that interview would be regarded by the commissioner as a continuous and constituent part of his sworn reply to that interrogatory. I therefore, on the 13th of May, 1863, made an order that Captain Jarman be re-examined by the prize commissioners on the twentieth interrogatory, and be allowed to add to his answer the explanatory statement contained in his affidavit before named, and that he be examined at the same time by the prize commissioners upon three special interrogatories which were framed by me, and were set forth in the order.

On the 16th of May, 1863, Captain Jarman was examined under this order, and his answer then made to the twentieth interrogatory was as follows: "When the passengers engaged their passage, they were distinctly told that they would not be allowed to carry any letters, papers, or dispatches in the ship. This was clearly understood. Before leaving Falmouth I received a telegram from J. Spence, Esq., the owner of the ship, instructing me to question the passengers as to whether they had any documents in their possession. I immediately called them together, and advised them as to my owner's instructions, and they, one and all, in the presence of each other, and in the presence of Mr. Mole, a passenger, and another passenger who left the ship at Falmouth, then declared that they had nothing in their possession of such description. The next day the last-named passenger came to me, and said he had made up his mind to return to London, intending to go out to Mexico by the West India mail packet. This passenger's name was Besbie or Besby, and he left me the same day, and went on shore at Falmouth. After the ship left Falmouth, Mr. Mole, the passenger above named, came to me and stated that he had a small packet of white powder—patent white powder, he called it—in which he and some of his friends were interested. I said, 'You had better deliver it up to me, for it is a dangerous article to have on board.' He gave it to me and I locked it up in my state-room. Nothing more was thought of this until we approached St. Thomas, excepting that I asked of him why he had not mentioned this before leaving Falmouth. He replied, as it was neither papers nor writings of any kind, he did not think it requisite. When the United States steamship Alabama approached us, I called Mr. Mole and told him I did not like having this packet of powder on board, and that, if the ship was likely to be searched, it must either be opened or destroyed, and then gave it in charge of one of my officers—the second officer, Mr. Harris—with orders to destroy this packet if I instructed him. I told him in that case to throw it overboard. Not being examined by the Alabama, it was not then destroyed. After leaving St. Thomas, we were boarded by a boat from the Vanderbilt. This boat left the ship, ordering me to remain until they returned. I then called Mr. Mole again, and requested him to let me see the contents of the package. To this he objected, saying it was a patent, and could not be seen by any one but himself and friends. So I ordered it to be thrown overboard, fearing it might jeopardize the ship in some way, and it was accordingly thrown overboard. I believe it to have been white powder, as stated by Mr. Mole, and had no reason to believe otherwise, and do not think anyone knew the contents of this packet but this same Mr. Mole. I do not now believe it was anything but white powder, as above stated. I told Mr. Harris, above named, that when I instructed him to throw it overboard, I expected to instruct him in case it was requisite for me to make myself positive on the point as to the contents. After the Vanderbilt's boat left the ship, I ordered Mr. Harris to throw this package overboard from the gangway. This was after the first boarding boat of the Vanderbilt left us, and before her boat came the second time, and after Mr. Mole refused

to let me see the contents." The following question was then put to Captain Jarman by the commissioner: "When you instructed Mr. Harris to throw this package overboard, did you instruct him to throw it over on the side of the ship away from the Vanderbilt's boat, so that the package could not be seen when it went over?" He replied: "I gave Mr. Harris an order to throw it overboard from the starboard gangway, that being the nearest to my cabin door. It might have been the side away from the Vanderbilt. The Vanderbilt certainly approached me on the starboard quarter. I do not know whether the Vanderbilt's boat was at that time on the port or starboard quarter. I do not recollect having instructed Mr. Harris in any other way than I have stated." Then follows this memorandum, signed by the commissioner: "The witness repeatedly refused to answer this question by a direct negative or affirmative, and, in all cases herein, was unwilling to answer without verbose explanations." The special interrogatories framed by the court were put to and answered by Captain Jarman, as follows: "1. Did you know, or had you ever been informed, or had you reason to believe, after your answers to the stated interrogatory aforesaid had been given by you and written down by the prize commissioner, and when did you first acquire such knowledge, information, or belief, that any other witness, and who, being one of the ship's company on the voyage in question, had, after your examination, and when, declared before such commissioner, that any papers, and what, on board the vessel, and on the voyage inquired about, had been burned, torn, thrown overboard, destroyed or cancelled, or attempted to be destroyed or cancelled, and by whom and when?" Answer: "After my examination had been finished and written down by the commissioner, and while awaiting my second interview with 'you, as suggested by you,' I did hear that the cabin boy had stated that I had put some papers in a tin box and thrown them overboard. I cannot say how many days it was after my examination. It might have been two or it might have been three days. I cannot be positive. The cabin boy's name was John Reed. I cannot say positively who told me. I think it was the cook. It was either the cook or steward." "2. Did you, at any time, and when and where, make or offer any statement or explanation to the prize commissioner previous to your examination and testimony in this suit on the 1st of April, 1863, in relation to the construction or concealment of any paper or papers, and what, on board the vessel, and on the voyage in question?" Answer: "I did not make or offer any statement or explanation to the prize commissioner previous to my examination and testimony in this suit, having been a prisoner, and in jail, up to the day when I was first examined by the commissioner. I therefore had no opportunity; nor at my first examination, as no question seemed to call for this explanation." "3. Did you apply to the prize commissioner for leave to inspect your answer to the twentieth interrogatory, of your own accord, after it had been attested to by you, or was your attention called to it by the commissioner, and did he inquire of you, and when and where, whether you understood that interrogatory, and your answer thereto, at the time your testimony was given, or make any other inquiry of you to that purport or effect, and when and where?" Answer: "I did not apply of my own accord for leave to inspect my answer to the twentieth interrogatory, but I was sent for by the commissioner, and then I made an explanation. At my first interrogation, I considered the twentieth interrogatory to apply to letters, bills of lading, or papers connected with the ship or cargo. When the interrogatory was read to me by the commissioner, at this second interview, I then made the explanation relative to the package which was thrown overboard. The commissioner, at this interview, did ask me whether I understood the twentieth interrogatory, and my answer thereto, and he read the same to me. I then explained as above stated. This interview took place at the office of the prize commissioner the same day after getting a note from the commissioner requesting an interview. I should think this was within three or four days after my first examination. That examination was made and completed on the same day, viz., on the first day of April, 1863." The following statement is added to the deposition, before the signature and jurat: "The witness desires permission to state that the cabin boy, John Reed, named herein, threatened, while on board ship, and before he reached this port, to do all he could to injure the witness, because he chastised him for neglect of duty." This was stated in the presence of many witnesses.

On the hearing of the case, the counsel for the claimants objected to the question put by the commissioner to Captain Jarman on re-examination, on the ground that the commissioner had no right to put any question that was not specified in the order for re-examination; and to the statement by the commissioner as to the witness refusing to answer, as being improper evidence. The court did not pass upon these objections at the time. On an objection taken by the district attorney, the court struck out as irrelevant the statement added by Captain Jarman as to the cabin-boy, Reed. I think that it was not proper for the commissioner to put to the witness, on his re-examination, any question except the 20th standing interrogatory, and the three special interrogatories. I also reject the statement of the commissioner as to the witness's refusal to answer; for, although, on the examination of a witness, his demeanor,

and his reluctance or readiness to answer, are very often material circumstances in affecting the credit to be given to his testimony, and although, in the case of written depositions, the court is deprived of the benefit of seeing the witness face to face, it is manifest that the practice of permitting prize commissioners to lay before the court, for its information and guidance, statements of the character of the one in question here, would lead to such abuse that it could not be safely tolerated in any well-regulated system of jurisprudence.

At the hearing of the case, the district attorney presented to the court the following copy of a letter, accompanied by a certificate from the department of state of the United States, under date of April 29, 1863, certifying that it was a true copy of the original on file in that department: "No. 77. Cornhill, E. C., London, Nov. 24, 1862. —— ——, Esq. Dear Sir: We may state, for the guidance of any friends who may be desirous of shipping to America, that arrangements have been made for the dispatch of a vessel by us to the Rio Grande, about the first week in December; that cost of freight and insurance on goods can be paid at the port of delivery. The services of the highly respectable firm of Messrs. Brown, Fleming & Co., at Matamoras, have been secured; also those of Mr. Redgate, Lloyd's agent, an expert in cotton, and who has been resident nearly 40 years in Texas and Mexico. That gentleman's services will be of great value to shippers in respect to his local knowledge and influence, as also as regards agency of the inland transit, and landing and shipping of goods and cotton. Mr. Harding, of the firm of Messrs. Harding, Pullien & Co., of this city, has been named, and consented to act as factor for the receiving of the proceeds in cotton, and the equal distribution of same to the shippers, according to value of respective shipments, and who will effect the necessary insurance. Further, a Mr. Besbie, of the Confederate States of America, holds a contract from that government, whereby he is to receive 100 per cent. on invoice cost, payable in cotton at specie value, clear of all charges of freight, &c., for any goods he may deliver into the Confederate States. Said contract has been authenticated by Mr. Mason and others. He is willing to share same, say to the extent of 50 per cent., with any houses who may feel inclined to ship. Moreover, said parties are at liberty to send out their own supercargoes, and, if the goods can meet with a better market, shippers by our vessel may avail themselves of said contract or not; but, in the latter case, there will be no certainty of getting cotton back, as the wagon traffic cannot be properly carried out without the aid of government support, in the shape of teamsters to attend to cattle, and which the Confederate government will supply from the army, to facilitate the inland transport of goods and the bringing back of cotton for the contract. In the event of peace or cessation of hostilities, the Confederate government, by the contract, binds itself to receive goods that are shipped but not delivered, and, for any orders not shipped, but in course of same, 10 per cent. profit upon invoice cost and charges. Any further information you may require we shall be happy to give our best efforts to obtain from the respective parties interested. We remain, dear sir, yours truly, Jas. I. Bennett & Wake." The district attorney also presented to the court an affidavit, made on the 24th of April, 1863, by Joshua Nunn, chief clerk in the United States consulate at London, appended to a copy of the foregoing letter, and deposing that the original letter was signed by the usual signatures of James I. Bennett & Wake, and that the copy was a true copy. This affidavit was verified by a certificate, as to its authenticity, by the United States consul at London, and by a certificate from the department of state of the United States, under date of May 7, 1863. This letter was offered, on the part of the government, as legitimate evidence in the cause. It was urged that the letter might have been produced by any of the witnesses, in answer to the 21st standing interrogatory; that, if so produced, it would have been competent evidence; that it clearly referred to the Peterhoff and her voyage, and was signed by the persons whose names appear in the papers of that vessel as the brokers of her cargo; that the letter was admissible on the authority of the case of The Romeo, 6 C. Rob. Adm. 351; and that, at all events, the letter, if not admissible at the hearing in the first instance, ought, being material evidence, to be admitted on an order for further proof. I do not think that on the authority of the case referred to, or according to the settled practice in prize cases, the letter is admissible in evidence when offered for the first time at the hearing. I accordingly rejected it. But while, if it were properly put in evidence in the case, I should regard it as a very material piece of evidence against the Peterhoff and her cargo, yet, upon the proofs in the case, I do not entertain any such doubt upon the question of condemning the vessel and cargo as to make it proper that I should direct an order for further proof, in order to permit the introduction in evidence of the letter.

An objection was taken at the hearing, by the claimants, to the jurisdiction of this court in the present case, on the ground that the Peterhoff was first taken to the port of Key West, and afterwards brought to the port of New York, it being insisted that the district court at Key West could alone take jurisdiction of the case. There is no force in this objection. In prize cases, the court of that district into which the property is carried and proceeded against has jurisdiction. The Merino, 9 Wheat. [22 U. S.] 391. The mere carrying of a vessel or of her cargo, seized on the high seas, as prize of war, into any par-

ticular district of the United States, without the institution there of any proceedings in prize, cannot affect or take away the jurisdiction over the property of the district court of another district, in which the proceedings against the property may be instituted, after the property has been carried into such other district.

In the opinion delivered by me in the Stephen Hart [Case No. 13,364] I stated that many of the principal questions involved in that case, and in the cases of The Springbok [Id. 13,264] and The Peterhoff were alike, and I announced, in that opinion, the leading principles of public law which lead to a condemnation in all the cases. In my opinion in the case of the Springbok I restated those principles. As the present opinion is necessarily of great length in consequence of the mass of documents and evidence in the case, I must content myself with referring to my opinions in the cases of The Stephen Hart [supra] and The Springbok [supra] for a full exposition of the authorities and the reasoning which support those principles.

A neutral vessel, laden with a neutral cargo, may lawfully trade between neutral ports in time of war, in all descriptions of merchandise, contraband or otherwise, without being liable to seizure by a belligerent. But a seizure is justifiable if a vessel be engaged in carrying contraband of war for or to the enemy, or to the port of the enemy. (Instructions of the Navy Department, of August 18, 1862, to the naval commanders of the United States.) And all contraband goods, even though belonging to neutrals, and found in neutral bottoms, are liable to capture and condemnation, if seized by a belligerent while on a destination for the use of the enemy of such belligerent. Ordinance of the Congress of the Confederation, of February 1, 1782, 5 Wheat. [18 U. S.] Append. p. 120; Halleck, Int. Law, c. 24, § 11, p. 576; 1 Duer, Ins. 630; The Commercen, 1 Wheat. [14 U. S.] 388, 389.

The doctrine of all the authorities, so far as it is applicable to the case of the Peterhoff, is, that if her voyage was an honest one, from one neutral port to another neutral port, and she was carrying neutral goods between those two ports only, she was not liable to capture; but that, if her voyage was a simulated voyage, and she was carrying articles contraband of war, really destined for the use of the enemy, and to be introduced into the enemy's country by transshipment from her, at the mouth of the Rio Grande, into other vessels, she and her cargo were liable to seizure and condemnation. These principles were very fully discussed by the late district judge for the Southern district of Florida in the case of The Dolphin and The Pearl [Case No. 3,975], and I refer to his opinions in those cases as being fully concurred in by me. According to these principles, the question as to whether or not the cargo of the Peterhoff was being transported in the business of lawful commerce is not decided by merely deciding the question as to whether she was documented for and sailing upon a voyage from London to the mouth of the Rio Grande. The commerce which the law regards is that which is dependent upon the destination and intended use of the cargo on board of the vessel, and not on the incidental voyage of a vessel which may be but one of many carriers through which the property is to reach its originally intended destination. The proper inquiry, in testing the lawfulness of the transportation of contraband goods, is whether they are intended for sale or consumption in the neutral market, or whether the direct or intended object of their transportation is to supply the enemy with them. If the immediate object of the voyage of the Peterhoff was to supply the enemy with contraband goods laden on board of her, she and her cargo were liable to capture, even though such goods were neutral property, and even though they were to be delivered in the first instance at a neutral port, provided they were destined for the direct use of the enemy. If the Peterhoff had on board goods contraband of war, which were destined, when they left England, for the use of the enemy, in the country of the enemy, and not for sale or consumption in Mexico, the mere destination of the vessel to Mexican waters, and even the mere intended landing of the goods at Matamoras, on their way to the enemy's country, would not exempt the vessel or her contraband cargo from lawful capture as prize of war. If it was the intention of those having control of the movements of the Peterhoff and of her cargo that she should merely lie in Mexican waters, at the mouth of the Rio Grande, and that her cargo, composed in large part of contraband articles, should be transported, after being unladen, into the enemy's country, either directly or by the way of Matamoras, then her voyage was not a voyage, in good faith, from one neutral port to another neutral port, but was, so far as respected the commerce in which her cargo was employed at the time of her seizure, a voyage in the course of prosecution to the country of the enemy, although she had not, as yet, reached the mouth of the Rio Grande, and although her regular papers documented her for a voyage from London to Matamoras, or to the mouth of the Rio Grande. If the intention that the contraband goods should reach the country of the enemy existed when they left England, that intention cannot be destroyed or rendered of no effect by the avowed, additional, and apparently innocent intention that the terminus of the transit of the vessel herself should be in Mexican waters. In such case, the sole purpose of the guise given to the transaction would be to have upon the papers of the vessel an ostensible neutral terminus for the voyage. If the object of sending the Peterhoff into Mexican waters at the mouth of the

Rio Grande was merely to trans-ship the contraband articles carried by her into lighters, to be transported to the country of the enemy, the only commerce carried on in such case would be the transportation of the contraband articles from England to the country of the enemy, as was intended when they left England. It is equally well settled that the ulterior destination of contraband goods determines the character of the trade, no matter how circuitous the route by which they are to reach that destination; that, even though the Peterhoff was destined to Mexican waters, and the goods were there to be unladen, yet if they were to be transported thence, by any mode of conveyance, to the enemy's country, the trade was unlawful; that the trade in contraband goods with the enemy's country, through neutral territory, is likewise unlawful; that the goods so shipped through neutral territory, even though they may be unladen and trans-shipped, are liable to condemnation; that, if the voyage of the Peterhoff was of such a character, it was an attempt to carry on trade with the enemy by the circuitous route of Mexican waters or a Mexican port, which the law will not countenance; that, under such circumstances, her voyage was illegal at its inception; and that she and the goods were liable to seizure at the instant it commenced. Halleck, Int. Law, c. 21, § 11, p. 504; 1 Kent, Comm. (8th Ed.) p. 85, note a; 1 Duer, Ins. p. 568, § 13; Jecker v. Montgomery, 18 How. [59 U. S.] 110, 115; 2 Wildm. Int. Law, 20; The Jonge Pieter, 4 C. Rob. Adm. 79; The Richmond, 5 C. Rob. Adm. 325; The Maria, Id. 365; The William, Id. 385; The Nancy, 3 C. Rob. Adm. 122; The United States, Stew. Vice Adm. 116; The Thomyris, Edw. Adm. 17; The Joseph, 8 Cranch [12 U. S.] 451.

In reference to this very case of the Peterhoff, the foreign office of Great Britain, in a letter to her owner, on the 3d of April, 1863, announced at its conclusion, after having communicated with the law officers of the crown, that the government of the United States has no right to seize a British vessel bona fide bound from a British port to another neutral port, unless such vessel attempts to touch at or has an intermediate or contingent destination to some blocked port or place, or is a carrier of contraband of war, destined for the enemy of the United States; that her majesty's government, however, cannot, without violation of the rules of international law, claim for British vessels, navigating between Great Britain and such neutral ports, any general exemption from the belligerent right of visitation by the cruisers of the United States, or proceed upon any general assumption that such vessels may not so act as to render their capture lawful and justifiable; that nothing is more common than for those who contemplate a breach of blockade, or the carriage of contraband, to disguise their purpose by a simulated destination and by deceptive papers; and that it has already happened, in many cases, that British vessels have been seized while engaged in voyages apparently lawful, and have been afterwards proved, in the prize courts, to have been really guilty of endeavoring to break the blockade, or of carrying contraband to the enemy of the United States. So, also, the inception of the voyage completes the offence; and, from the moment that the vessel, with the contraband articles on board, quits her port for the hostile destination, she may be legally captured. It is not necessary to wait until the goods are actually entering the enemy's country; but, the voyage being illegal at its commencement, the penalty immediately attaches, and continues so long as the illegality exists. Halleck, Int. Law, c. 24, § 7, p. 573; 2 Wildm. Int. Law, 218; 1 Duer, Ins. 626, § 7; The Imina, 3 C. Rob. Adm. 167; The Trende Sostre, 6 C. Rob. Adm. 390, note; The Columbia, 1 C. Rob. Adm. 154; The Neptunus, 2 C. Rob. Adm. 110.

The new course of trade to which the present war has given rise is notorious; and this court has abundant evidence in regard to it upon its own records. Neutral vessels, almost always under the British flag, are cleared from England, with papers giving an ostensible destination, for both vessel and cargo, to Cordenos, in Cuba, or Nassau, N. P., or Matamoras, on the Rio Grande, in Mexico, all in neutral waters. Those destinations are used merely for call or trans-shipment, either as a new point of departure for a further voyage of the same vessel to a port of the enemy, or as a place of trans-shipment of the cargo to another vessel, in which it may enter the country of the enemy, the cargo being composed, in almost every instance, more or less, of articles contraband of war. Numerous cases have been before this court in which this course of trade has been developed, and it has been a subject of comment in the British parliament. Earl Russell, in the house of lords, on the 18th of May, 1863, alluded to it as a well-known fact, that vessels had been sent from England to Nassau, "in order to break the blockade at Charleston, Wilmington, and other places, and carry contraband of war into some of the ports of the Southern states;" and he remarked that, in a case of simulated destination,—that is, a vessel pretending that she is going to Nassau, when she is in reality bound to a port of the enemy,—the right of seizure exists. So, too, in the house of commons, on the 29th of June, 1863, the then solicitor general of England, Sir Roundell Palmer, referred to the case of The Dolphin [Case No. 3,975], and remarked that the principles of the judgment in the case of The Dolphin were to be found in every volume of Lord Stowell's decisions; that it was well known to everybody that there was a large contraband trade between England and America by way of Nassau; that it was absurd to pretend to shut their eyes to it; and

the trade with Nassau and Matamoras had become what it was in consequence of the war. A prize court will not shut its eyes to a well-known and obvious system of conducting trade with the enemy in contraband articles. Nor, in a case like the present, where the demand of the enemy of the United States, for articles contraband of war, was so largely increased by the sealing up, by means of the blockade, of the enemy's ports on the Atlantic coast, and where so great a need of cotton existed in England, which could not be supplied to any great extent from the country of the enemy, except from the cotton fields of Texas, through the Rio Grande, can the court fail to recognize the existence of special reasons for the adoption of such a course of trade as appears, by the evidence, to have been adopted in the case of the Peterhoff. The Rosalie and Betty, 2 C. Rob. Adm. 343.

The representations upon the papers of the Peterhoff of the neutrality of her voyage, are, of course, not conclusive; and it is claimed on the part of the government that the evidence shows that her voyage was being prosecuted in bad faith, and under illusive semblances, and that the intent and purpose of her owner were that her cargo should be taken from her at the mouth of the Rio Grande by lighters, and be landed in the country of the enemy; that she drew too much water to cross the bar at the mouth of the river, and could never reach the port of Matamoras; that her cargo was composed very largely of articles contraband of war; that it was intended, on her departure from England, that these articles, and all the rest of her cargo, should be landed from her in the country of the enemy; and that the evidence in the case is such as to require the condemnation, not merely of the contraband articles, but of the rest of the cargo, and of the vessel herself.

I have already very fully analyzed the documents found on board of the Peterhoff, the contents of her cargo, and the testimony of the witnesses. I shall, therefore, content myself with stating the conclusions on the various questions of fact to which my mind has been brought by the entire evidence. In the examination which I have made of the case, I have derived valuable assistance from the printed arguments furnished me by the learned district attorney and by the special counsel for the captors.

The Peterhoff, a steamer of the burden of 669 tons, laden with a cargo of assorted merchandise at London, left that port early in January, 1863, documented for a voyage to Matamoras, upon the Rio Grande, in Mexico. She was built in Great Britain, and her registered owner is Joseph Spence, of London, ship-builder. Prior to her present voyage, she was owned by a person named Pearson, of Hull, England, whose name is familiar to this court, from its records, as a person heretofore largely engaged in supplying contraband goods to the enemy of the United States, and in sending out vessels to run the blockade. On the voyage immediately preceding the present one, she carried a cargo of cotton from Nassau to Liverpool. Under the agency of James I. Bennett & Wake, as brokers, acting in behalf of Joseph Spence, or his firm of Pile, Spence & Co., her cargo, on her present voyage, was laden by a large number of shippers, all of them British subjects, with the exception of Samuel J. Redgate, who is a citizen of the United States, and was a resident of Texas at the time of the breaking out of the war. The shippers of the cargo were, according to the bills of lading, twenty-six in number, the bills of lading being thirty-nine in number. Of the bills of lading, nine were indorsed to Robert Bowden, a passenger, four to George W. Almond, a passenger, three to Captain Jarman, the master of the Peterhoff, two to Samuel J. Redgate, a passenger, two to Samuel J. Redgate & Co., and one to Samuel J. Redgate and George W. Almond. Of the remaining eighteen bills of lading, nine were indorsed in blank, and were found in the possession of the master or of some of the passengers, two of these nine being shipments by Samuel J. Redgate, and two of them being shipments by J. Spence. There were, in addition, one bill of lading, not indorsed, of goods shipped by Captain Jarman, and eight bills of lading, not indorsed, of which no duplicates were found on board, and which were also found in the possession of the master or of some of the passengers. Duplicates were found of thirty of the bills of lading, and of one of them (being one of a shipment by Samuel J. Redgate, indorsed in blank) there were four sets found. The entire number of packages found on board, excluding five cases of samples, was 4,472. Of these, 533 were covered by the bills of lading indorsed to Bowden, 772 by those indorsed to Almond, 143 by those indorsed to Captain Jarman, 155 by those indorsed to Redgate, 72 by those indorsed to Redgate & Co., 501 by the one indorsed to Redgate and Almond, 1,878 by those indorsed in blank, (of which latter the number of packages shipped by Redgate was 379, and the number shipped by J. Spence was 1,432). 403 by those not indorsed, and of which there were no duplicates, and 15 by the one not indorsed, and in which Captain Jarman was the shipper. While proceeding on her voyage, and going towards St. Thomas for a supply of coal, the Peterhoff was, on the 20th of February, 1863, overhauled by the United States steamer Alabama, and, after her papers had been examined, allowed to proceed to St. Thomas. On the 25th of February she left St. Thomas, and was overhauled by the Vanderbilt. Her papers were examined by the boarding officer, who immediately returned to the Vanderbilt, leaving directions that the Peterhoff should remain stationary while he communicated with his commander. Shortly afterwards the boarding officer returned to the Peterhoff, and gave to Captain Jarman a

message from the commander of the Vanderbilt, to the effect that the captain should proceed, with the papers of his vessel, on board of the Vanderbilt. Captain Jarman refused to do so. The officer again returned to the Vanderbilt, and shortly afterwards a sufficient force from that vessel was sent on board of the Peterhoff to take possession of her. Shortly afterwards another officer from the Vanderbilt demanded the papers of the Peterhoff, to take on board the Vanderbilt, and the demand was refused. The Peterhoff was immediately sent to Key West as a lawful prize, and thence to New York.

A claim to the vessel and cargo was put in by Captain Jarman, on behalf of their owners, but that claim disclosed no name of any owner. The claim of Mr. Mackie, the agent at New York of the English underwriters, in averring the ownership of the steamer and her cargo by the underwriters, necessarily implies that the vessel and her cargo were insured from loss by capture, and that the ownership of the vessel and cargo was vested in the underwriters by virtue of an accepted abandonment after a loss by capture. The copy of the policy of insurance, found on board of the vessel, (if it be entitled to be regarded as a copy of a complete policy,) purports to be a policy on the hull and machinery of the vessel, and contains the clause, "warranted free from capture, seizure, detention, and all consequences of hostilities." This, as far as it goes, is consistent with the claim put in by Mr. Mackie, as the underwriters could have no claim to the vessel and cargo, in consequence of their capture, unless they had been insured by the underwriters against loss by capture, and unless the title to them had vested in the underwriters, by reason of an abandonment after a loss by capture. So, too, the claim by the underwriters admits the lawfulness of the capture; for without a lawful capture there could be no condemnation and no loss; and the averment of the ownership by the underwriters, which ownership could only arise in consequence of an accepted abandonment, admits a lawful capture of the insured steamer and cargo, and they were subject to lawful condemnation.

The claim of Redgate is, as owner, agent, and assignee, to $175,000 in value of the cargo. According to the appraisement of the prize commissioners, which was about $257,000 for the whole cargo, the value of the goods on board, covered by the bills of lading indorsed to Redgate, Redgate & Co., and Redgate and Almond, and by the bills indorsed in blank, in which Redgate was the shipper, was less than $23,000. Almond, in his claim, claims, as owner, agent. and consignee, cargo to the value of $150,000, while, according to the valuation by the prize commissioners, that part covered by the bills of lading indorsed to him was valued at only a little over $55,000. According to the valuation by the prize commissioners, that part covered by the bills of

lading indorsed to Bowden was valued at over $113,000. As no claim was interposed by Bowden to any part of the cargo; and as Captain Jarman only claims the cargo for its owners generally; and as no claims to any portions of the cargo were put in, except those by Redgate and Almond; and as there was cargo of the value of over $50,000, according to the valuation of the prize commissioners, covered by bills of lading indorsed in blank, (exclusive of what was shipped by Redgate,) and by bills of lading not indorsed, it would seem to follow, necessarily, that Redgate must have had control over large portions of the cargo which were not covered by bills of lading in which he was the shipper, or by bills indorsed to him. Indeed, he says, in his answer to the 9th interrogatory, on his re-examination, that he acts as agent for the portion of the cargo represented by the bills indorsed to Bowden; and, in his claim, he claims as owner, agent, and consignee. At the valuation by the prize commissioners, the value of the cargo covered by the bills indorsed to Bowden, and those indorsed to Redgate, Redgate & Co., and Redgate and Almond, and those indorsed in blank, in which Redgate was the shipper, and thus the value of what is confessedly represented by Redgate, is nearly $136,000, or more than one-half of the entire valuation by the prize commissioners. Redgate does not state in his claim what specific portions of the cargo he claims as owner, nor what as agent, nor what as consignee. There can be no doubt whatever that Redgate must be regarded as a citizen of the enemy's country, within the decisions of the supreme court in Jecken v. Montgomery, 18 How. [59 U. S.] 110, and in the Prize Cases, 2 Black [67 U. S.] 635, although he calls himself a citizen of the United States, and says that he resides in Matamoras. He was a citizen of the United States, residing in Texas, at the time of the breaking out of the war, and he never has owed any allegiance either to Mexico or to Great Britain. Upon this principle, all the cargo on board of the Peterhoff which was owned by Redgate, or was in his custody and charge for the time being, is confiscable as enemy's property. It is, also, a well-established principle, that a citizen of the enemy's country, as Redgate was, cannot appear as a claimant, because he has no persona standi in court. Halleck, Int. Law, c. 31, § 23, p. 772; 3 Phillim. Int. Law, § 461; The Falcon, 6 C. Rob. Adm. 199.

Almond's claim is on behalf of himself. as owner, agent, and consignee, to cargo of the value of $150,000. It is to be noted, that while Captain Jarman, in his test oath to his general claim to the vessel and her cargo, on behalf of their owners, says that the vessel and cargo will belong, if restored, to subjects of Great Britain, yet neither Redgate nor Almond, in their claims or test oaths, make any averment that any of the

cargo represented by them as agents or consignees will belong, when restored, to subjects of Great Britain, although great pains is taken in the testimony, to show that the shippers named in the bills of lading were British subjects.

The witnesses, all of them, admit their knowledge of the war, and of the blockade, by the naval forces of the United States, of the ports of the enemy. Captain Jarman and the passengers, Bowden, Almond, and Redgate, all of them declare that the Peterhoff had no goods on board contraband of war. All of these four witnesses, except Bowden, were interested personally, as owners, in portions of the cargo, and large portions of the cargo were in the charge of them and of Bowden, by indorsements to them of bills of lading. But Tregidgo, the third officer, specifies, as contraband, boots and shoes, army clothing, and medicines; and Duffay specifies smiths' anvils and bellows. Captain Jarman swore, on his first examination, that no papers connected with the voyage, the ship, or the cargo, were destroyed; that all the papers that were on board of the vessel at her last clearing port were in the hands of the prize commissioners; that he tore up some letters from his wife and father at the time of the capture; but that, with that exception, none were destroyed, concealed, or in any way disposed of, to his knowledge, by any person. Redgate and Bowden testified that they knew nothing of any papers being burned, torn, thrown overboard, destroyed, canceled, or attempted to be concealed. Almond mentioned the destruction, by order of Captain Jarman, of a package which was in charge of Mr. Mohl, a passenger, but he said he was ignorant of its contents, and he fixed the time of its destruction as being the morning of the day the Peterhoff arrived at St. Thomas, but could not say whether it was before or after she was overhauled by the Alabama. The officers and crew of the vessel, on their examination, disclosed a very different state of facts in regard to this package, and in regard to the destruction of papers, which testimony I shall particularly refer to, hereafter. It showed clearly that papers were thrown overboard by order of Captain Jarman, after the Peterhoff had been boarded by the Vanderbilt, and while the boarding officer was absent to procure a prize crew from the Vanderbilt. Thereupon, Captain Jarman had his attention directed, by the prize commissioner, to the 20th interrogatory, it being again read to him, with his answer to it. He then stated to the prize commissioner the circumstance of the throwing overboard of the package received from Mohl, and said that it contained white powder, and that Mohl was unwilling that it should be opened, because of it being patented. Captain Jarman gives as an excuse for not mentioning, at his first examination, the circumstance

of the throwing overboard of this package, that he considered the 20th interrogatory to apply to letters, bills of lading, or papers connected with the ship or cargo; and it is claimed on his behalf, that his reply to the prize commissioner, when asked, at the interview subsequent to his first examination, if he desired to add to or alter his answer to the 20th interrogatory, that he did not desire to change or add to it, was a proper one, for the reason that, as the package contained only the patent white powder, and not papers, it was not at all relevant to the interrogatory to place on the record anything in reference to the package. It must be borne in mind, that when Captain Jarman was thus called before the commissioner, he had not read the testimony given by the other witnesses in respect to the destruction of the papers. That testimony was, all of it, subsequently filed in court, on the 21st of April, 1863. On the same day, an order was made by the court that the proofs be opened. On the 27th of April, 1863, Captain Jarman, having obviously been made acquainted with the whole testimony, made his affidavit, setting forth his statement in respect to the package of white powder, for the purpose of the motion which was made by the claimants, that he be allowed to add that statement to his answer to the 20th interrogatory. He was, by order of the court, re-examined on the 16th of May on the 20th interrogatory, and on three special interrogatories. On that examination he gives his version of the destruction of the package which he was told was white powder. What he says has been already recited at length.

There are many things about this statement of Captain Jarman which are utterly incredible, and his whole statement is full of inconsistencies. He says that he told all the passengers, before leaving Falmouth, that they would not be allowed to carry any documents, and that they all declared that they had none; that, after they left Falmouth, Mohl, a passenger, came to him and said that he had a small packet of patent white powder; that he, Captain Jarman, said to Mohl that he had better deliver it up to him, for it was a dangerous article to have on board; and that Mohl then gave it to him, and he locked it up in his stateroom. Why it was thought to be a dangerous article is not stated. If it was really thought by Captain Jarman to be a dangerous article to have on board, he certainly would have thrown it overboard immediately, instead of locking it up in his stateroom. He then says that nothing more was thought of it until they approached St. Thomas; that, when the Alabama approached them, he called Mohl, and told him that he did not like having the packet of powder on board, and that, if the ship was likely to be searched, it must either be opened or destroyed; that he then gave it in charge of Harris, the second officer, with orders to throw it overboard,

if instructed by him; and that it was not then destroyed, because the vessel was not examined by the Alabama. He gives no reason for the obvious connection between the approach of the Alabama and his disinclination to having the package on board; or between a search of his vessel by the Alabama and his desire to throw overboard the package; or between the departure of the Alabama without examining the Peterhoff and his resolution not to destroy the package. If it was dangerous to have the package on board for any other reason, except that it contained what could not be submitted to the inspection of the officers of the Alabama, it would have been dangerous to have it on board during the entire voyage to St. Thomas, and as well after the departure of the Alabama as before her approach. The whole transaction clearly shows that the only danger connected with the package was the danger of having it examined by the officers of a United States vessel. And what possible danger could there be in having it so examined, unless it contained evidence of some unlawful transactions? Captain Jarman then says, that after a boat from the Vanderbilt had boarded the Peterhoff, and had left her again, ordering her to remain stationary, he called Mr. Mohl, and requested him to let him see the contents of the package; that Mohl objected to this, saying that it was a patent, and could not be seen by any one but himself and friends; and that so he, the captain, ordered it to be thrown overboard, fearing that it might jeopardize the ship in some way, and it was accordingly thrown overboard. The approach or presence of a cruiser of the United States seems to have been the only cause sufficiently powerful to draw attention to the danger of having this package on board, and it seems to have been an adequate cause to that end. Captain Jarman does not state how, according to his fear, the package might jeopardize the ship. How could it jeopardize the ship at the moment when the boat was expected back from the Vanderbilt with a prize crew, unless it was that a search of the vessel and an examination of the contents of the package would have disclosed evidence to justify the seizure and condemnation of the ship? Captain Jarman says that he believes the contents of the package to have been white powder, as stated by Mohl; and that he does not think that any one knew the contents of the package but Mohl. But Captain Jarman has no warrant manifestly for any belief as to what were the contents of the package, except what Mohl told him. Tregidgo says that Mohl told him he resided in Texas, and Reed says that when they were boarded by the Alabama, Mohl burned some note-paper with a "Confederate flag" upon it. Under these circumstances it would hardly be safe to rely upon hearsay evidence, derived only from Mr. Mohl, as to the contents of the package. This entire story, as to the contents of the package being white powder, is unworthy of belief.

The fact that a package, which was given to Captain Jarman by Mohl, was destroyed, is abundantly proved. Almond testifies to the fact, although he makes it to have occurred on the day they arrived at St. Thomas. But, that there was a destruction of papers, both by burning and throwing overboard, the witnesses (other than Captain Jarman and the three passengers) all agree. There is no substantial difference in their testimony. Harris, the second mate, who threw overboard the package, by the orders of the captain, says that it was a square paper package, and that it was thrown overboard after the first boarding by the officers of the Vanderbilt, and before the prize crew took possession. He says that Captain Jarman told him not to let any one see it; that Captain Jarman had given him that same paper parcel once before, at the time the Alabama stopped the Peterhoff, and before she was boarded by the Alabama, and had told him, at that time, to keep the parcel, and throw it overboard, if told by him, Captain Jarman, or if he, Captain Jarman, made a sign to him; and that, as he did not then throw it overboard, he gave it back to the captain. Tregidgo, the third officer, confirms this testimony of Harris, in all particulars, and adds, that Captain Jarman ordered Harris to throw it overboard from a part of the ship where it would not be observed from the Vanderbilt; that Harris did so; that he heard Captain Jarman call the packet "dispatches"; and the packet was sewed up in canvas, and weighted with lead, so that it would sink; and that Mohl appeared very much distressed at the necessity of throwing it over. Tregidgo says that he has been a midshipman in the British navy, and is accustomed to seeing the form in which dispatches are made up; that the package so thrown overboard was put up in the same way; that there was no mark upon it, and that there was a heavy weight of lead at each end; that the first time he saw it or knew of it was when the Alabama boarded them; and that he then saw it, and saw at once that it was a packet of dispatches. Campbell confirms the testimony of Harris, and says that the parcel was a sealed parcel, wrapped in brown paper, and was heavy. He also relates the arrangement for throwing the package overboard at the time of the visit of the Alabama, and says that when the prize crew came off from the Vanderbilt he saw Captain Jarman drop the parcel overboard from the starboard gangway. Murphy, assistant engineer, shows that it was understood on board that some papers were thrown overboard by Harris, and he speaks of Webber as being aware of that fact. Webber also shows that it was understood on board, among the crew, that some papers

had been thrown overboard by Harris just before the Alabama boarded them. He also says that he saw the packet that Harris was said to have thrown overboard, although he did not see him throw it over, and that it looked like a brown paper parcel. Reed confirms the testimony of Harris as to the arrangement for throwing overboard the package at the time of the visit of the Alabama, and as to its being thrown overboard, by order of Captain Jarman, while the boat from the Vanderbilt was coming a second time to the Peterhoff. Reed says that it was a box of papers, and that he saw the captain put the papers into the box, and that the captain told Harris to put something into the box to sink it, and to throw it overboard, on a signal, this being at the time of the visit of the Alabama; and that, after they were boarded by the Vanderbilt, he saw Harris throw the box overboard. Whatever discrepancies there may be in this testimony, the substantial fact remains, that a package, which was understood and believed, by the disinterested officers and crew on board, to be papers, was thrown overboard by the second mate, by order of the captain, when it was manifest that a prize crew was coming on board from the Vanderbilt, to take possession of and search the Peterhoff. The story of the white powder only adds to the conviction of the court, from all the evidence, that this package contained papers which it was important to destroy, for the reason that they would have shown that the Peterhoff and her cargo were liable to seizure and to condemnation.

But there is testimony as to the destruction of other papers. Duffay says that Webber, the steward, gave him a package of papers, or something that was printed, which looked like a book "that had been tossed from a great many hands," and told him to burn it; that he did so; that he does not know its contents; and that this was about the time the Vanderbilt captured them, and while they were outside of the harbor of St. Thomas, after having been in. Webber says that he gave Duffay, to burn, some newspapers belonging to Mohl, who gave them to him, Webber, to be burned, and that he, Webber, gave them to Duffay, and told Duffay to burn them. Murphy, the assistant engineer, says that he heard on board that some papers had been destroyed by Duffay. Tregidgo says that some written papers were burned by Duffay. Reed says that Webber was sent by the captain with a bundle of papers to Duffay to burn. Whatever it was that was burned by Duffay, the burning seems to have been caused by the visit of the Vanderbilt. And, unless it clearly appears exactly what the writings were that were burned, the presumption as to what was burned by Duffay, as well as to what was thrown overboard by Harris, must be taken most strongly against the claimants. Duffay calls it "a package of papers or something that was printed," and says "it looked

like a book." He had it in his possession, apparently, longer than any other of the witnesses. Reed calls it a "bundle of papers." Tregidgo calls it "written papers." Webber calls it "newspapers." It is quite apparent, also, that what was thrown overboard by Harris, and what was burned by Duffay, came from the possession of Mohl. There is further evidence showing that Captain Jarman recognized the necessity, in view of a search of his vessel of destroying certain papers. Webber, the steward, says that after the Peterhoff had been boarded by the Alabama or the Vanderbilt, the captain gave him a small package of papers, on blue foolscap sheets, about two sheets, and told him that if he, the captain, was taken out of the ship, he, Webber, must tear up and destroy those papers; but that he handed the papers back to the captain several hours afterwards, and did not destroy them. In this testimony Webber is confirmed by Reed, who says that, when Webber returned from giving to Duffay the papers to be burned, the captain gave Webber two papers to hide, and that in case the captain was taken out of the ship, then Webber was told to destroy them, and the captain made a motion with his fingers as if to tear them; and that this occurred in the pantry. It is very clear, therefore, that Captain Jarman felt the necessity of destroying papers. Under these circumstances, the presumption would be, not only that he destroyed the papers which he thus handed to Webber, but that the package which was thrown overboard, under such a pressing exigency, contained papers. The only testimony contained in the evidence of the witnesses, as to the destination of the cargo other than what results by implication from their averments that the vessel was bound to Matamoras, is in the evidence of Tregidgo, who says that he heard Heyck, one of the passengers, say that the cargo was to go across the river from Matamoras into Texas; and that he is very confident of this.

I have already particularly referred to the various papers found on board of the vessel. The register, the shipping articles, the invoices, the bills of lading, and the clearance, all of them appear fair on their faces. I have also alluded to the fact that there were no invoices of the thirty sets of artillery harness, the buckles, or the bagging, or the drugs consigned to Burchard & Co., of Matamoras. What may have been contained in the mail which was on board has not been made known, for the reason that the mail was delivered up unopened. No letter of instructions to Captain Jarman was found on board, nor any letters to any consignees, nor were there found on board any letters giving any instructions to any person in regard to any disposition of the cargo of the vessel, unless such letters may have been in the mail bag. Almond says that he had no consignees, but was to select his own, and that he had no written instructions; and Redgate says that

he had no letters and no instructions as to the mode of disposing of the cargo. By the manifest, all the goods are specified as consigned "to order," except the packages addressed to Burchard & Co.; and, by reference to the bills of lading, it appears that in all cases where they were indorsed specially to the order of any person, the indorsee was a passenger on board the vessel, having the care of that portion of the cargo. The manifest, although it contains a printed heading, "Description of Goods," has, under that head, no designation whatever of any article of merchandise, whether contraband or otherwise, but only specifies, under that head, so many boxes, bales, cases, kegs, coils, packages, casks, bundles, chests, and trunks, except in some unimportant instances. In one instance, in the thirteenth item in the manifest, which now reads, under the head of "Description of Goods," "145 coils," the word "rope" was at first written after the words "145 coils," and it can still be read, under a very heavy erasure with ink. And although afterwards, in the manifest, there are found specified in different places, 50 coils. 45 coils, and 20 coils, yet the word "rope" does not appear now after any one of those entries, nor does it appear ever to have been written there. Rope and cordage are well settled to be contraband articles, as much so as arms; and the invoices of these 260 coils of rope show 215 of them to have been Manilla rope, and the rest tarred hemp rope. The bills of lading contain, every one of them, carefully written in it, a statement that the Peterhoff is bound for "off the Rio ·Grande, Gulf of Mexico, for Matamoras;" and also. in writing, the following: "Goods to be taken from alongside the ship, at the mouth of the Rio Grande, at consignees' risk and expense, within 30 days of arrival, providing lighters can cross the bar, or a penalty will be incurred of ten pounds per day after that period;" also, in writing, a provision that the goods are to be delivered "off the Rio Grande, Gulf of Mexico, for Matamoras;" also, in each case, except the bill of lading for the 52 packages addressed to Burchard & Co., that the goods are to be delivered "unto order," and, in that excepted instance, that they are to be delivered "unto Messrs. Burchard & Co., successors, Matamoras." The court will take judicial cognizance of the well-known facts, that Matamoras lies on the right bank of the Rio Grande, the river which forms the boundary line between Mexico and the United States at that point, several miles up from the mouth of the river, and nearly opposite the town of Brownsville, in Texas; that the river is very narrow at that place; and that, at the mouth of the river, is a bar, which at all times prevents the entrance into the river of a vessel drawing as much water as the Peterhoff; she drawing, as was admitted by the counsel for the claimants at the hearing about sixteen feet. In this view, the provision in the bills of lading, that the goods are to be taken from alongside of the ship, by means of lighters, at the mouth of the Rio Grande, becomes intelligible, making it apparent that the vessel was not to go herself to Matamoras, but was to go no further than the mouth of the Rio Grande. And, from the language of the provision in the bills of lading, it would seem that there were times when even lighters could not cross the bar at the mouth of the river.

There are some things, in respect to the log-book of the Peterhoff, which are quite open to observation. It commences on the 30th of November, 1862, and the entries from that time to the 5th of December, 1862, covering three pages. are filled with a voyage from Liverpool to London; and the heading across the top of those pages describes the log as one of a voyage from Liverpool towards London. The heading of the next two pages describes the log as being a log of the steamer while lying in London harbor. The next six pages have no headings whatever. They embrace the period from December 16, 1862, to January 7, 1863, both inclusive. The entries during that time show that the vessel was lying at London, taking in cargo. The next two pages, covering the entries of January 8 and 9, 1863, have this heading: "Log of the S. S. Peterhoff, from London towards Plymouth," some word having been erased over which the first half of the word "Plymouth" is written. The next page, embracing the entries of January 10 and 11, has the heading: "Log of the S. S. Peterhoff, lying in Plymouth." The next page, embracing the entries of January 13, 14, and 15, has no heading. The next page, embracing the entries of January 16 and 17, has the heading: "Log of the S. S. Peterhoff, lying in Plymouth." The next two pages embracing the entries of January 18, and 19, have, each of them, the heading: "Log of the S. S. Peterhoff, from Plymouth." The latter one of these two pages being a left-hand page, and there being no heading to the next right-hand page. And there is no further heading whatever in the book, over any of the entries in it, which extend from January 20 to March 9. Upon the title-page of the log-book there appear printed the words, "A log-book containing the proceedings on board the;" then written, the words "S. S. Peterhoff;" then printed the words "from the port of;" then written, the word "London;" then printed, the word "to;" then written, the word "Matamoras;" then printed, the words "Commanded by;" then written, the words "Capt'n S. Jarman, R. N. R.;" then printed, the word "Commencing," the blank after which is not filled; then printed, the word "Ending," the blank after which is not filled; then printed, the words "Kept by;" then written, the words "H. Bound." Notwithstanding this title-page, the voyage with which the log-book commences is one from Liverpool to London, occupying from November 30, 1862, to December 6, 1862. at which date she arrived at London. She remained at London until the 7th of January. All the entries in the

log-book, from its commencement to and including the 18th of December, 1862, covering five pages and a half, are signed "Hugh Ewing," who, it is presumed, was her mate at that time. The entries in the handwriting of Bound do not commence till the 19th of December, and all the rest of the entries in the book are in his handwriting, and at the close of the last entry, on the 9th of March, is his signature. It results, then, that there is no indication or suggestion, anywhere in the log-book, as to any destination of the vessel after she left Plymouth, except what may be gathered from the entry on the title-page, and that is the title-page of a log-book, the first voyage in which is one from Liverpool to London. There is no evidence as to when the entry on the title-page was made. It is manifestly in the handwriting of Bound, and, of course, was made after he joined the vessel at London. But whether it was made before or after the capture of the Peterhoff by the Vanderbilt cannot be known, because Bound continued his entries in the log-book until and including the 9th of March, which was two days after the Peterhoff came to anchor at Key West, she having been captured on the 25th of February. Aside from the title-page, there is not a word in the log-book, either in the heading of any page or in the body of the entries, to indicate to the officers of any cruiser examining it whether she was bound on the voyage on which she was captured; nor is Matamoras or the Rio Grande anywhere mentioned in the entries in the log.

The utter absence, from the manifest and bills of lading, of any satisfactory information as to the true contents of the packages on board of the Peterhoff, composing her cargo, induced the making of the order for the discharge and inspection of her cargo. The court has, in the official report of the commissioners, filed June 2, 1863, an inventory of the contents of the cargo, being the result of the opening and examination of a sufficient number of packages to show what was on board. The commissioners reported that there were 4,472 packages of cargo, exclusive of five cases of samples. They also reported that a large portion of the cargo was "particularly adapted to army use;" that large numbers of cases contained "Blucher boots," known as "army shoes;" that a number of cases contained "cavalry boots," so labelled—a label annexed to the report, from one of the trunks of boots, specifying its contents as "100 army Bluchers," and one annexed, from another trunk, specifying its contents as "36 cavalry boots;" that 192 bales of the cargo consisted of "gray blankets," "adapted to the use of an army," and believed to be such as are used in the United States army; that 95 cases contained horseshoes of a "large size;" that 36 cases of a large size, contained "artillery harness," in sets for four horses, with two riding-saddles attached to each set; that there were also on board "two hydraulic presses," in pieces, adapted for "cotton;" and that a considerable portion of the cargo consisted of drugs, directed, "Burchard & Co., successors, Matamoras, Mex'o," in which, among an assorted lot of drugs, quinine, calomel, morphine, and chloroform formed an important portion. The inventory annexed to the report filed June 2, 1863, shows that, in addition to the articles thus particularly referred to by the commissioners, there were found 305 coils of rope, (45 of the coils mentioned in the manifest consisting each of two coils of rope,) 501 boxes of tin, 29 casks of sheet zinc, 1,343 bundles of hoop iron, 280 bundles and bars of steel or iron, 42 anvils, 60 blacksmiths' bellows, and some quinine and assorted drugs. An examination of the invoices found on board of the Peterhoff shows that the number of pairs of Bluchers and Blucher boots found on board was 14,450, of which 1,000 pairs are called, in the invoices of them, "men's army Bluchers;" that the number of pairs of long artillery boots was 180; that there were 5,580 pairs of the gray blankets, of which 2,000 pairs are called, in the invoices of them, "government regulation gray blankets;" that the quantity of horseshoes contained in the 95 casks was 9 tons; that of the 305 coils of rope, 90, weighing over 5 tons, were tarred hemp rope, and 215, weighing about 11 tons, were Manilla rope, the weight of the 305 coils being about 16 tons; that the 29 casks of sheet zinc weighed about 14 tons; and that the 1,343 bundles of hoop iron were of the weight of 34 tons. No invoices were found of the 36 cases of artillery harness, but the appraisement report of the prize commissioners, of November 19, 1863, shows that there were 30 complete sets of russet artillery harness for four horses, contained in 30 cases, and that the 6 other cases contained 258 heavy russet artillery halters, and 600 galvanized halter chains. Nor were there any invoices of the drugs consigned to Burchard & Co., but the appraisement report of November 29, 1863, shows that those drugs consisted of 2,300 ounces of quinine, 1,000 pounds of calomel, 245 pounds of chloroform, and sundry other drugs. The invoices on board also show that, including the quinine and assorted drugs mentioned in the report filed June 2, 1863, there were, in addition to the drugs consigned to Burchard & Co., the following drugs: 340 ounces of quinine, 20 pounds of chloroform, 16 pounds of opium, 38 ounces of morphine, and various other drugs; that there were, also, 200 pairs of shoes, which the invoice of them calls "negro brogans;" and, also, 379 yards of blue military cloth and blue military serge, 307 pieces of scarlet, white, and blue bunting, several saddles, bridles, and saddle-cloths, a quantity of harness-rings, harness-buckles, bridle-buckles, martingale-rings, and trace-chains, 1,559 yards of gunny cloth, 1,988 yards of

stout cotton wrapping, 52,000 horseshoe nails, 3½ tons of nails, 42 anvils, weighing 4½ tons, 644 bars of cast steel, and some waiste-belts and ball bags.

The remark of the commissioners, in their report filed June 2, 1863, is, that a very large portion of the cargo was particularly adapted to army use; and this observation is fully warranted, in view of the quantities of Blu-chers and Blucher boots, cavalry and artillery boots, gray blankets, horseshoes, military cloth, sets of artillery harness and saddles and bridles, to say nothing of the coils of rope, tin, sheet zinc, hoop iron, steel, anvils, and blacksmiths' bellows, and quinine, chloroform, morphine, opium, and other drugs, all of which were not only useful for army purposes, but were, many of them, articles of which there was great need in the army of the enemy, by reason of the stringency of the blockade of their ports. It is laid down by all writers on international law, that implements and munitions of war, which, in their actual condition, are of immediate use for warlike purposes, are to be deemed contraband whenever they are destined to the enemy's country, or to the enemy's use. Halleck, Int. Law, c. 24, § 13, p. 577; 3 Phillim. Int. Law, § 229. By the treaty of commerce between France and Denmark, in 1742, cord-age was declared to be contraband; and, by the treaty of 1801, between Great Britain and Russia, to which Denmark and Sweden subsequently acceded, saddles and bridles were enumerated as contraband, the list being further augmented, by the convention of July 25, 1803, by the addition of equipments for cavalry. Halleck, Int. Law, c. 24, § 16, p. 580. The 18th article of the treaty of November 19, 1794, between the United States and Great Britain, (which treaty is no longer in force,) enumerated the articles which, in future, should be esteemed contraband of war, and specified, among those articles, horse furniture, holsters, belts, and generally all implements of war, as also cordage, and generally whatever might serve for the equipment of vessels, excepting, however, wrought iron; and declared that those articles should be just objects of confiscation whenever they were attempted to be carried to the enemy. 8 Stat. 125. The law of prize, as universally established by the prize courts of Europe and the United States, declares that all instruments and munitions of war are to be deemed contraband, and that rule is held to embrace, by its terms and by fair construction, among other articles, all military equipments and military clothing. Halleck, Int. Law, c. 24, § 20, p. 583, and authorities there cited. It is, also, an established doctrine of the English admiralty, that all manufactured articles, which, in their natural state, are fitted for military use, or for building and equipping ships-of-war, among which articles cordage is included, are contraband in their own nature, to the same extent as instruments and munitions of war, and no exception is admitted in their favor, except by express provisions of treaty. Halleck, Int. Law, c. 24, § 21, p. 584, and authorities there cited; The Charlotte, 5 C. Rob. Adm. 305; The Neptunus, 3 C. Rob. Adm. 108; 2 Wildm. Int. Law, 212. These principles assign, without any question, to the list of contraband articles found on board of the Peterhoff, as being instruments of war, if they were destined to the use of the enemy or to the enemy's country, the following articles, being either military equipments, military clothing, manufactured articles fitted, in their natural state, for military use, or cordage, namely: the 14,450 pairs of Bluchers and Blucher boots, the 180 pairs of long artillery boots, the 5,580 pairs of gray blankets, the 30 sets of artillery harness, and their accompaniments of halters and halter-chains, the saddles, bridles, saddle-cloths, waiste-belts, and ball-bags, and the 305 coils of rope. It is also claimed, on the part of the libellants, that the horseshoes contained in the 95 casks, and which the report of the commissioners describes as horseshoes of a large size, were designed for the cavalry service of the enemy, and were wholly unsuitable for any such existing service in Mexico; that the anvils and blacksmiths' bellows were such as accompany army forges; and that those articles, together with the tin, sheet zinc, hoop iron, and cast steel, the 2,640 ounces of quinine, 265 pounds of chloroform, 1,000 pounds of calomel, 16 pounds of opium, 38 ounces of morphine, and other drugs, and the blue military cloth, if not necessarily contraband in themselves, under all circumstances, must, in view of the quantities of them found on board of the Peterhoff, and the demand existing for some, if not all of them, for the use of the army and navy of the enemy, be considered as contraband in the present case, if they were going to the country of the enemy. I do not intend to hold that any of these articles are contraband, other than such as come under the head of military equipments, military clothing, manufactured articles fitted, in their natural state, for military use, and cordage, although strong reasons might be urged for including many of the other articles named within the list of contraband; under the circumstances surrounding this case. It is said, in Moseley, Contr. War, p. 9: "The tendency of all the recent authorities, both in works written on the subject and in judicial decisions, especially the decisions of Sir William Scott, goes to show that contraband or not contraband of war is a question of evidence, to be determined in each case by reference, not to one particular rule of law, but many; not to any one fact, however strong that may be, but to all the circumstances connected with the goods in question. It is not only, or not so much, whether the goods are, in themselves, or as belonging to a class, capable of being applied to military or naval use, but wheth-

er, from all the circumstances connected with them, those very goods are or are not destined for such use."

It is also laid down by high authority, that the probable use of articles is inferred from their destination; and that, if articles capable of military use are going to a place where any need of their employment in military use exists, it will be presumed that they were going for military use, although it is possible that they might have been applied to civil consumption. Halleck. Int. Law, c. 24, §§ 23, 24, pp. 586, 587; 1 Kent, Comm. 140; 3 Phillim. Int. Law, § 254. The large quantities of the articles found on board of the Peterhoff which are claimed to be contraband, and which are not strictly military equipments, or military clothing, or manufactured articles which, in their natural state, are fitted for military use, is a circumstance worthy of consideration, on the question as to whether those articles were probably intended for the ordinary uses of life, or were destined for military use. This remark applies with great force to the horseshoes, of which there were 95 casks, containing 9 tons, and to the drugs, among which there were 2,640 ounces of quinine, 265 pounds of chloroform, and 1,000 pounds of calomel. As none of the articles alleged to be contraband can be so, unless they were going to the country of the enemy, the question of their destination is vital. If a hostile destination can be certainly assigned to one portion of this cargo, and that a portion which was under the charge of Captain Jarman, and of the passengers, Redgate, Almond, and Bowden, a like destination can properly be assigned to all the articles composing the cargo, as they were all of them under the charge of Captain Jarman and those passengers. For I am led to the conclusion, upon the whole evidence, that there was a concert of action between Captain Jarman and those three passengers, in respect to the cargo. Bowden has put in no claim to any part of the cargo, but has made Redgate his agent, by power of attorney, in reference to the part of the cargo represented by the bills of lading indorsed to him, Bowden; and Captain Jarman put in a claim to the vessel and the entire cargo, "for the interests of his principals, the owners of the steamer Peterhoff, her tackle, &c., and cargo." The same kinds of articles are found to have been covered by the bills of lading indorsed to Captain Jarman and to the three passengers. Thus, by the bills indorsed to Bowden, are covered 500 pairs of brown-gray blankets, 700 pairs of Blucher boots, and 1,122 pairs of Bluchers; by the bills indorsed to Almond, 2,000 pairs of gray blankets, 7,128 pairs of Bluchers, 20 coils of Manilla rope, and a quantity of martingale-rings, bridle-buckles, straps, waiste-belts, and ball-bags; by the bills indorsed to Redgate & Co., a quantity of halter-chains, harness-buckles,

martingale-rings, bridle-buckles, trace-chains, riding saddles, bridles, and saddle-cloths; by the bills indorsed to Redgate, 145 coils of Manilla rope; by the bills indorsed to Captain Jarman, 2,000 pairs of government regulation gray blankets, 50 coils of Manilla rope, 140 ounces of quinine, 20 pounds of chloroform, and a quantity of morphine, opium, and other drugs; and by the bills indorsed in blank, in which J. Spence is named as the shipper, (he being the owner of the Peterhoff,) 90 coils of tarred hemp rope, and a cotton press. The invoices of that rope and cotton press, and of the 10 bales of gunny cloth and the 13 bales of cotton wrapping, marked "Peterhoff, owner," are all on the same sheet, and are each headed thus: "Adventure to Matamoras. per S. S. Peterhoff, to Pile, Spence & Co., Dr."

Joseph Spence, the owner of the Peterhoff, was one of the firm of Pile, Spence & Co. That firm is spoken of by several of the witnesses as the owners of the Peterhoff, and it is that firm that is named in the papers found on board as the owners of the cotton press or presses, and of the gunny cloth and cotton wrapping, and of 90 of the coils of rope. J. Spence is named as shipper in the bill of lading covering the cotton press, the packages containing which were marked "P. S. & C.," and are specified in the bill of lading as "11 packages hydraulic press." Under another bill of lading. Mr. Spence was the shipper of 362 packages of merchandise, which contained 90 coils of tarred hemp rope, and large quantities of hardware, and the smiths' bellows and anvils. The cotton press is described by the prize commissioners, in their appraisement report of November 19, 1863, as one hydraulic press, 8-inch cylinder, with bed-plate and braces, 2 heavy iron-bound boxes for pressing cotton, 4 bars of railroad iron, and 8 car wheels, all in 11 packages, with 4 other packages containing iron implements, in bagging, supposed to be the same mark. The commissioners, in their report filed June 2, 1863, speak of there having been on board two hydraulic presses, in pieces, adapted for cotton. There was an invoice found on board, showing that Pile, Spence & Co. bought of J. Bowes, of Manchester, December 24, 1862, "1 hydraulic press, with ram to lift 4 feet, and set of pumps complete," for £170, and "2 birch railway boxes, bound with iron, and fitted up with wheels, stillages, rails, &c.," for £75, being a total, less 1½ per cent. discount, of £241. 6s. 6d. The bill of the cotton press above referred to, headed, "Adventure to Matamoras, per S. S. Peterhoff, to Pile, Spence & Co., Dr.," reads thus: "Marks, P. S. & Co., 1 to 11, cotton press, £250." There is also a letter from J. Bowes to Pile, Spence & Co., dated Manchester, December 26, 1862, saying: "I herewith enclose a tracing of the cotton press, erected. This shows it erected for cotton goods, but the only difference, when

put up for pressing cotton, is, that the table is put level with the ground, so that the boxes can run on the table. This tracing may be useful to the parties putting it up. You see, from the enclosed letter, how necessary it was to have some cash ready. I have had some trouble in having to get the work done at different places, but got all made right and sent off on the 24th inst., and hope it is safe at the ship by this time." The tracing accompanying that letter has three figures upon it, drawn by hand on rice paper, one a side elevation, one an end elevation, and one a view of the pumps. It is headed "8-inch hydraulic press and pumps, rise of ram 4 feet, scale ½ inch to a foot." Upon the tracing this is written at the bottom: "For pressing cotton the rollers at side are not required, and the table is fixed level with the floor. This tracing is only for a ram, with short lift, for Manchester goods." There is also some writing on the tracing, carefully erased with ink. A lithographed circular was also found on board, the heading of which is, "Bellhouse's wool or cotton press, by hydraulic power," and which contains a cut of the press, and the following lithographed text: "The inside dimensions of the box are 40x2.6x7.0. The rise of ram is 5 feet 6 inches. The box is stationary, and the upper portion is hinged, so that, when the wool or cotton is pressed, the doors can be opened, and the bales canvassed and corded." The following is written in ink upon the circular: "All the parts marked thus, X, become separated for packing, and require about 84½ cubic feet of space;" and there are ten parts marked X on the cut. There was also found on board a press copy, on tissue paper, of a letter, dated January 31, 1863, signed "J. Spence." and addressed, "Capt. Jarman, S. S. Peterhoff," which says: "This will probably be handed to you by Mr. Bennett. I have arranged with him that the cotton press and gunny cloth are to be considered on joint account of the ship and the charterers. I have handed him the bills of lading. You will have to receive the freight on them for the ship's ac., viz., £71. 18s. 10d. for the cotton press; £47. 4s. 6d. for the gunny cloth. Both these amounts are indorsed on the bills of lading which Mr. Bennett has with him. Should you call at St. Thomas you will find a press copy of this letter. The news from America has rather a peaceful prospect." There was also found on board a press copy of a letter, dated Manchester, January 20, 1863, signed "J. Bowes," and addressed to J. Spence, Esq., which says: "The putting together of the cotton press is a very simple matter, and will not, I think, require any particular instructions, especially if Captain Jarman has a drawing of the press, which shows it erected complete, and which I sent to Mr. Pile some time ago. To save time, I will write Mr. Pile this post, and request him to send you the drawing."

In this connection, some correspondence found on board is of importance. There is a letter from James I. Bennett & Wake to Pile, Spence & Co., dated London, October 27, 1862, as follows: "Referring to our negotiation relative to the matter of the laying on of a first-class screw-boat, of about 700 to 800 tons gross register, to proceed to the Rio Grande, it is understood and agreed between us, that half the difference between the freight earned out and home, after deduction of the hire, at the rate of 30s. per ton per month, together with the cost of coals, pilotage, port charges, extra labor, and all the expenses usually borne by charterers of a government time-charter, be credited to and paid to us, as agents, by way of commission; that half the freight for the cotton brought home in the cabins, houses, and bunkers, (if any free,) and space on deck, is to be credited to and paid us, and that, as such agents, and by way of further comm'n, we are to have an additional comm'n of five per cent. on gross amount of freight, as a consideration for our services in procuring this freight or employment. We shall esteem it a favor your confirming the within." To this letter Pile, Spence & Co. replied on the same day, by a letter to James I. Bennett & Wake, as follows: "We have your favor of this date, respecting the freight out and home of a first-class steamer for Rio Grande, which we beg to accept, confirm, and agree to." Then there is a further letter from James I. Bennett & Wake to Pile, Spence & Co., dated London, January 17, 1863, as follows: "The following are the conditions we understand to be agreed between us as to the cargo home for the S. S. Peterhoff. If a cargo is found at Matamoras producing £4,000 freight, the capt. is to accept same, and return as quickly as possible. In the event of the captain having £2,500 offered, and accepting better and other employment, then we are to be credited £250 for £2,500, and, in proportion, up to £4,000. If the Peterhoff does take a cargo from Matamoras, the results are to be matter of ac. between us, as originally arranged by letter, dated 27th October." It is quite apparent, from this correspondence, which clearly relates to the Peterhoff and the voyage on which she was captured, that it was intended by Pile, Spence & Co., and James I. Bennett & Wake, that she should bring home a cargo of cotton from the Rio Grande. She carried out, as part of her cargo, a cotton press, the property of Pile, Spence & Co., or of Joseph Spence, her owner. The destination of the cotton press, which the documents referred to show to have been intended for the pressing of cotton, was undoubtedly the state of Texas, within the country of the enemy. It is well known that cotton is raised in Texas very largely, and that it is not raised in Mexico. It was in Texas that the cotton press would be useful, and would

find a market, and unquestionably its destination was to Texas, the country of the enemy. The same documents show that the avowed intention was, that the Peterhoff should bring back a cargo of cotton, which could come only from Texas, and the cotton press was needed there to compress the cotton, so that when stowed on board of the vessel it would occupy as little space as possible. It is also shown by the invoices that, among the articles covered by one of the bills of lading indorsed to Bowden, were 200 pairs of what are called in the invoice which covers them, "negro brogans." The destination of these is indicated by the fact that negro slavery and a negro population exists in Texas, and does not exist in Mexico. Their destination was undoubtedly to Texas. The unmistakable destination of the cotton press and the negro brogans to the country of the enemy must, on all the evidence in the case, be regarded as affixing the same destination to the rest of the cargo, as well to that not contraband as to the contraband. As to the latter, there was no army or navy in Mexico, at or near Matamoras, to be supplied by the military equipments, the military clothing, the manufactured articles fitted, in their natural state, for military use, and the cordage. Nor could there have been any demand in Mexico for the large quantities of the other articles found on board of the vessel. The evidence is entirely satisfactory that the whole of the cargo had the same destination to the country of the enemy which the cotton press and the negro brogans must have had.

I have alluded to the fact that the mail bag found on board of the Peterhoff was, on the application of the district attorney, ordered by the court to be given up to the British authorities, it having been a public mail put up in London by the post-office authorities there, and directed to the postmaster at Matamoras. The contents of this mail were not inspected before its delivery. The state department, charged with the foreign relations of the government, deemed it most proper to direct the district attorney to make application to the court for the surrender of the mail bag, unopened, to the British authorities. The court, regarding the district attorney as entitled to control the proceedings in the suit, and as entitled to dispense, on his part, with the contents of the mail bag as evidence in the case, if he desired to do so, granted the application. It was urged, on the hearing, by the special counsel for the captors, that the natural presumption must be, that there were in that mail bag letters relating to the cargo of the Peterhoff, as no letters to any consignee were found on board, nor were any letters found in the possession of any of the passengers respecting the disposition of the cargo; that, if the cargo was in truth intended for delivery in Mexico, the letters relating to it would have shown that fact, and would have been evidence to show the lawfulness of

the voyage and the unlawfulness of the capture; that if, on the other hand, those letters contained evidence that the cargo was intended for delivery in the enemy's country, for the use of the enemy, an examination of them would have disclosed such evidence; that the effect of the surrender of the mail bag and its contents, under these circumstances, was merely to preclude the libellants and the captors from any reliance on such proof as might have been drawn from the contents of the letters in it; that the claimants in this case had a right to insist, in vindication of the lawfulness of the voyage of the Peterhoff, and of the lawfulness of the commerce in which she was engaged at the time of her capture, and with a view of showing the neutral destination of the cargo, if it, in fact, had such neutral destination, that the mail bag should be opened and its contents examined; that if it contained no letters on the subject of the voyage or of the cargo, no harm would have ensued to any one; that if it contained letters showing the lawfulness of the voyage, and the neutrality of the destination of the cargo, this would have been evidence in favor of the claimants; that the claimants asserted no such right, but quietly acquiesced in the surrender of the mail bag and its contents, and made no opposition thereto, although represented in court by their counsel when the application was heard by the court; and that this conduct on the part of the claimants, under all the circumstances surrounding this case, affords the strongest possible evidence of their knowledge that the surrendered mail bag contains proofs which would inculpate the vessel and her cargo, and their owners. But I cannot regard this position as a sound one. It cannot be presumed that the mail bag contained any letters relating to the cargo. There is no evidence that it did, or that any of the claimants knew that it did. And, moreover, after the surrender of the mail bag, unopened, on the application of the prosecuting officer of the government, I do not think that any speculation as to its contents can properly be indulged in, conducing to support the prosecution.

I am led to the conclusion, upon all the evidence, that the Peterhoff, when captured, although ostensibly upon a voyage from London to neutral waters at the mouth of the Rio Grande, was laden with a cargo composed largely of articles contraband of war, which were not designed, on their departure from England, to be sold or disposed of in the neutral market of Matamoras, but were designed to be delivered, either directly, or indirectly by transshipment, in the country of the enemy, and for the use of the enemy. The character and quantity of the articles composing the cargo were such as to show that the cargo had very little adaptation to the Mexican market, or to the small port of Matamoras, so far as any legitimate use or sale, or consumption of it in Mexico was concerned. It was admirably adapted, in every particular, to the market of the enemy; and

large quantities of the articles composing it were those for which there was a very urgent demand to supply the pressing wants of the enemy. The gain which was looked for by the shippers of the cargo only could have resulted from the sale of it to the enemy, and in the enemy's country, and could not have resulted from any sale of it in Mexico for consumption there. The conduct of Captain Jarman, when visited by the officers from the Vanderbilt, as shown by the entries in the log-book of the Peterhoff, was inconsistent with an innocent destination of the vessel and cargo. He twice refused to comply with the demand of the commander of the Vanderbilt to go, with his papers, on board of that vessel. That is the ordinary method of exercising the belligerent right of visitation and search. In The Maria, 1 C. Rob. Adm. 340, 360, Sir William Scott says: "The right of visiting and searching merchant ships upon the high seas, whatever be the ships, whatever be the cargoes, whatever be the destinations, is an incontestable right of the lawfully commissioned cruisers of a belligerent nation." In that case, the commander of a British cruiser fell in with several Swedish merchantmen, under convoy of a Swedish frigate, and sent an officer on board of the frigate to inquire about the cargoes and destination of the merchantmen, and was answered that they were Swedes, bound to different ports in the Mediterranean, laden with hemp, iron, pitch, and tar. In reference to this state of things, Sir William Scott says (page 371): "The question, then, comes, what rights accrued upon the receipt of his answer? I say, first, that a right accrued of sending on board each particular ship for their several papers; for each particular ship, without doubt, had its own papers; the frigate could not have them; and the captors had a right to send on board them to demand those papers, as well under the treaty as under the general law. A second right that accrued upon the receiving of this answer was a right of detaining such vessels as were carrying cargoes so composed, either wholly or in part, to any ports of the enemies of this country; for that tar, pitch, and hemp, going to the enemy's use, are liable to be seized as contraband in their own nature, cannot, I conceive, be doubted, under the modern law of nations. Thirdly" (page 373), "another right accrued, that of bringing in, for a more deliberate inquiry than could possibly be conducted at sea upon such a number of vessels, even those which professed to carry cargoes with a neutral destination." In referring to the judgment of Sir William Scott in the case of The Maria, Historicus, a recent English writer of public reputation, in a letter on the right of search, being one of a series of letters by Historicus on "Some Questions of International Law" (London, 1863; p. 178), says: "The rights of the belligerent against the neutral are laid down by Lord Stowell with great precision, under three distinct

heads: (1) The right to send on board for the ship's papers. (2) The right to detain such vessels as are carrying cargoes of a contraband character, either wholly or in part, to an enemy's port. (3) The right to bring in, for a more deliberate inquiry than could possibly be conducted at sea. even those which profess to carry cargoes to a neutral destination." The refusal, by the master of a neutral merchant vessel, to permit the papers of his vessel to be taken on board of a belligerent cruiser, when demanded, to be there examined by the commander of the cruiser, especially after those papers have been already so far examined on board of the merchant vessel, by a subordinate officer from the cruiser, so as to excite suspicion concerning their regularity, is, on the part of the neutral master, a resistance to the right of visitation and search, even though he offers his papers for examination on board of his own vessel, and his vessel for search. After the refusal by the master of the Peterhoff to permit his papers to be taken on board of the Vanderbilt for examination there, the commander of the Vanderbilt would not have been justified if he had not sent in the Peterhoff for adjudication. The log-book states, under date of February 25, 1862, that an officer from the Vanderbilt came on board of the Peterhoff, overhauled her papers, and then returned on board of the Vanderbilt, demanding that the Peterhoff should remain stationary; that the officer then came again on board of the Peterhoff, and demanded that Captain Jarman should take his papers on board of the Vanderbilt; that Captain Jarman refused to do so, "being in charge of her majesty's mails"; that the officer then left, threatening to send an armed crew on board; that a prize crew then came from the Vanderbilt and took charge of the Peterhoff; that, a short time afterwards, another officer came from the Vanderbilt, and demanded that the Peterhoff's papers should be taken on board of the Vanderbilt; that this was refused, at the same time full liberty being given by Captain Jarman for the papers to be overhauled on board, or the ship searched; and that then the prize crew took charge of the Peterhoff, and told Captain Jarman that he was not to consider himself any longer in charge.

The evidence is entirely satisfactory that papers on board the Peterhoff were destroyed at the time of her capture, some by being burned and some by being thrown overboard. Those that were thrown overboard were so disposed of by the direct orders of Captain Jarman at the time, and all the circumstances of the case are such as to warrant the conclusion that the papers so thrown overboard must have contained matter in relation to the Peterhoff and her cargo which it was important should be concealed from the knowledge of the officers of the United States cruiser. To the destruction of those papers Captain Jarman added, in the first place, the false assertion, in his first an-

swer to the 20th interrogatory, that no papers were destroyed or disposed of at the time of the capture, except some letters from his wife and father which he tore up. Then, after he had heard, as he himself says, in his answer to the first special interrogatory on his re-examination, that it had been testified that some papers had been thrown overboard, he came forward with the story that the package thrown overboard contained white powder. It is sufficient to say that this story cannot be believed. Captain Jarman does not pretend that any one but Mohl knew anything about the contents of this package, and the story as to the white powder is not supported by a particle of testimony from any of the other witnesses. Almond speaks of the package, and says that Mohl gave it up to be destroyed, at Captain Jarman's request, and that Captain Jarman ordered it to be destroyed, because Mohl objected to its being opened, and that he himself never knew what it contained. Although Almond was made aware of all these facts at the time, yet he does not pretend to have heard from Mohl, or from Captain Jarman, the story that the package contained a patented white powder. The entire conduct of Captain Jarman in throwing overboard this package, and in denying the destruction of any papers, and in then inventing this absurd tale, is open to the most severe criticism. The rule of law on this subject is well settled. The spoliation of papers on board of a neutral vessel, when overhauled by a belligerent cruiser, is, of itself, a strong circumstance of suspicion. 1 Kent, Comm. 157. "It is certain," says Sir William Scott in The Hunter, 1 Dod. 480, 486, "that, by the law of every maritime court of Europe, spoliation of papers not only excludes further proof, but does, per se, infer condemnation, founding a presumption, juris et de jure, that it was done for the purpose of fraudulently suppressing evidence which, if produced, would lead to the same result; and this surely not without reason, although the lenity of our Code has not adopted the rule in its full rigor, but has modified it to this extent, that, if all other circumstances are clear, this circumstance alone shall not be damnatory, particularly if the act was done by a person who has interests of his own that might be benefited by the commission of this injurious act. But, though it does not found an absolute presumption, juris et de jure, it only stops short of that, for it certainly generates a most unfavorable presumption. A case that escapes with such a brand upon it is only saved so as by fire. There must be that overwhelming proof, arising from the concurrence of every other circumstance in its favor, that forces conviction of its truth, in spite of the powerful impression which such an act makes to its entire reprobation." But although, both in England and in the United States, spoliation of papers is not held to furnish of itself sufficient ground for condemnation, but to be a circumstance

open to explanation (The Hunter, 1 Dod. 480; The Pizarro, 2 Wheat. [15 U. S.] 227), yet, if the explanation be not prompt or frank, or be weak and futile, if the case labors under heavy suspicions, or if there be a vehement presumption of bad faith, or gross prevarication, it is ground for the denial of further proof, and condemnation ensues from defects in the evidence, which the party is not permitted to supply (1 Kent, Comm. 158; The Pizarro, 2 Wheat. [15 U. S.] 227; Bernardi v. Motteux, Doug. 574, 579, 580). In Moseley, Contr. War (page 99), it is laid down that, however regular the papers of a vessel, and however well documented the ownership of the property, if, from the examination of the master, his prevarication and suppression of evidence, and manifest falsehood as to some points, and if, from the known character of the owners and agents of the vessel, as connected with contraband trade, there be fair reason to doubt them, they will be disregarded. In the case of The Two Brothers, 1 C. Rob. Adm. 131, the master had burned some letters before capture, which he said were only private letters. Sir William Scott, in commenting upon that circumstance (page 133), says: "No rule can be better known than that neutral masters are not at liberty to destroy papers; or, if they do, that they will not be permitted to explain away such a suppression, by saying 'they were only private letters.' In all cases it must be considered as proof of mala fides; and, where that appears, it is an universal rule to presume the worst against those who are convicted of it. It will always be supposed that such letters relate to the ship or cargo, and it was of material consequence to some interests that they should be destroyed." Sir William Scott also commented in that case upon the circumstance that the fact that the destruction of the letters did not come out on the master's deposition with frankness, but was added afterwards, when the circumstance had been disclosed by another witness; and he based his decision in the case very much upon his conclusion that the master was in a great measure discredited, from the whole complexion of the case. In the case of The Rosalie and Betty, 2 C. Rob. Adm. 343, 353, Sir William Scott says: "What has been the conduct of the master? It is said, and truly said, that in various parts of his evidence he is a gross falsifier, so as effectually to discredit his own testimony. But will this stop here? I apprehend not. It goes much farther, and extends to the character of his employer; for, where a master prevaricates so grossly as this man does, I cannot suppose that he would be a voluntary falsifier, or that, without an interest, or without instruction or subornation, he would lead himself into such a labyrinth of fraud. I cannot help thinking that the conduct of this master has been such as will reasonably affect the credit and the property of his employers." In the case of The Rising Sun, 2 C. Rob. Adm. 104,

106. Sir William Scott says: "Spoliation is not alone, in our courts of admiralty, a cause of condemnation; but, if then circumstances occur to raise suspicion, it is not too much to say of a spoliation of papers, that the person guilty of that act shall not have the aid of the court, or be permitted to give further proof, if further proof is necessary." The proof being satisfactory that papers on board of the Peterhoff were destroyed by the orders of Captain Jarman, and such destruction not having been satisfactorily explained, but having been attempted to be explained by a resort to an absurd and manifestly fabricated story, the inference which the court must draw from the destruction of the papers is that, if produced, they would have furnished proof of the unlawful character of the voyage of the Peterhoff, and that she was carrying contraband articles, destined to be delivered in the enemy's country, by transshipment from her at the mouth of the Rio Grande.

There are many other concurring circumstances, which are inconsistent with an honest neutral commerce, and only consistent with a design to introduce contraband articles into the country of the enemy. The manifest of the cargo does not disclose the articles on board, but only mentions the cargo as consisting of boxes, bales, cases, kegs, coils, packages, casks, bundles, chests, and trunks, except in a few unimportant instances; and, in one instance, in the manifest, the word "rope," which had been written after the word "coils," has been carefully erased. If the cargo was in good faith designed for sale in the neutral market of Matamoras, a disclosure, in the manifest, of the contraband articles on board would have done no harm, because the commerce would have been lawful, and the merchandise not contraband, even though the entire cargo had consisted of munitions of war. The suppression in the manifest, which is a most important paper to be carried by a vessel in time of war, in reference to her cargo, especially when she is near the country of a belligerent, of all facts tending to show what articles were on board designed and adapted for army and navy purposes, cannot be looked upon in any other light than as a confession that those articles were destined to be delivered in the enemy's country, and for the enemy's use, and were, therefore, contraband. It is true that invoices of nearly all of the cargo were on board, but those invoices were almost all of them in the possession, not of the master, but of the passengers, and formed no part of the ship's papers. The proper paper of a vessel, to show the particulars of her cargo, is her manifest; and, when the boarding officer of a cruiser demands of the master of a merchant vessel the papers of his vessel, he obtains, as the paper showing the particulars of the cargo, the manifest, and not the invoices. In some of the treaties of the United States with foreign countries, it has been provided that, when the two nations are at war, the vessels of both of them, being laden, must be provided, among other papers, "with certificates containing the several particulars of the cargo, that so it may be known whether any forbidden or contraband articles be on board of the same." The Amiable Isabella, 6 Wheat. [19 U. S.] 1; Treaty of 1795 with Spain, art. 17 (8 Stat. 148); Convention of 1800 with France, art. 17 (8 Stat. 186). This rule exists and is to be administered, whether embodied in treaty stipulations or not, and the foundation of it is that in time of war, the documents properly constituting the documents of a merchant vessel should show the particulars of her cargo, especially where, as in the present case, she was documented for neutral waters just outside the limits of the country of one of the belligerents, those neutral waters being extensively used as a mere convenience for the transshipment of cargoes bound to that country. Moreover, there were no invoices whatever found on board for the sets of artillery harness, and the halters and halter chains accompanying the same, or for a large quantity of the harness rings and buckles, or for any of the quinine, chloroform, calomel, and other drugs addressed to Burchard & Co., Matamoras. So, too, the bills of lading found on board are of such a character as to indicate that the cargo was not intended, in good faith, to be delivered at Matamoras, for sale or use there, but was to be delivered in the enemy's country. No one of the thirty-nine bills of lading covering the cargo contains the name of any consignee, with the exception of the one for the fifty-two packages addressed to Burchard & Co., Matamoras. All the other bills, which embrace all the rest of the cargo, declare the merchandise to be deliverable to the order of the shippers. Of the thirty-nine bills, twenty-one are indorsed to four persons who were on board of the vessel at the time of her capture (three of them being passengers, and one being her master), nine are indorsed in blank (of which nine, two are for shipments made by Redgate, and two for shipments made by Spence, the owner of the vessel), and nine are not indorsed (of which nine, one is for goods of which Captain Jarman was the shipper). All the bills of lading, as well those indorsed specially to the passengers and master, as those indorsed in blank, and those not indorsed, and originals as well as duplicates, were found in the possession of the passengers or the master. Captain Jarman says that all the cargo, except what was consigned to Burchard & Co., was represented by himself and the three passengers, Redgate, Almond, and Bowden; and Redgate says that the cargo would have been at the disposal of the persons holding the bills of lading. These bills of lading entirely fail to disclose the truth as to the contraband articles on board of the vessel. In the bill of lading for the cotton press, it is called a "hydraulic press," and the only other articles mentioned in the bills of lading in such a manner

as to enable any one, on an inspection of them, to tell what articles were to be found among the cargo, are the following: bagging, rope, wrought steel, seeds, nails, iron hoops, tin, gunny cloth, cotton wrapping, boots, iron drums, blankets, smiths' bellows, spades, shovels, anvils, and medicines.

Under all the circumstances surrounding this case, and in view of all the departures from the ordinary course of commercial transactions, it is not credible that there was a design, in good faith, to sell and dispose of the cargo in the market of Matamoras. Of this nature is the inference to be derived from the character and quantity of the contraband portion of the cargo, if it had a hostile destination. The gray blankets, the Bluchers and Blucher boots, the cavalry and artillery boots, the artillery harness, and the coils of rope, were especially adapted to the use of the enemy, as were also the cotton press, the smiths' bellows and anvils, the quinine, chloroform, opium, morphine, and other drugs, and the horseshoes, which the commissioners report to be horseshoes of a large size, it being understood that mules and small horses are used in Mexico, as a general thing, while cavalry horses are used by the enemy. Another fact of marked significance is that among the passengers on board of the vessel were two residents of Texas, who, for the purposes of this case, must, under the adjudications of the supreme court in Jecker v. Montgomery, 18 How. [59 U. S.] 110, and in The Prize Cases, 2 Black [67 U. S.] 635, be considered as public enemies. One of them, Redgate, was, at the commencement of the war, a citizen of Texas, and admits, now, that he is a citizen of the United States. This admission he took great pains to make on the record of his testimony, having caused it to be corrected, by erasure and interlineation, from his testimony as first given, which was that he was once a citizen of the United States, and now owed allegiance to Mexico, and thought he did not owe allegiance at present to the United States. He is the claimant, as owner, either alone or jointly with others, or as agent or consignee, of a considerable portion of the cargo, which portion must be condemned as being enemy's property, irrespective of all other considerations. The other passenger, Mohl, told the witness Tregidgo that he was a resident of Texas. He, with three other passengers— Edwards, Heyck, and Ellsworth—left the Peterhoff at Key West, because, as Captain Jarman testifies, they had no interest in the cargo. Mohl's persistence in refusing to permit the contents of the packages in question to be examined by any person, for the reason assigned by him, as stated by Captain Jarman, that the contents were a white powder, which was patented, and could not be seen by any one but himself and friends, taken in connection with the circumstances under which the package was thrown overboard, and with the particular time selected for throwing it overboard, and with the fact that it had been previously arranged to throw the same package overboard, in case of the search of the Peterhoff by officers from the Alabama, besides leading to the conclusion that documents were contained in the package of a character so dangerous that they were thrown overboard when it was manifest that the officers from the Vanderbilt were about to search the Peterhoff, and, at the same time, so important to be preserved that they were not sacrificed by Mohl save at the last extremity, and with the greatest reluctance, producing in Mohl, as testified to, by Tregidgo, an appearance of great depression at the necessity of destroying the package, might perhaps warrant the presumption that Mohl was an agent of the enemy.

The witness Tregidgo, who was formerly a midshipman in the British navy, and who stands entirely uncontradicted and unimpeached, testifies that he heard Mr. Heyck, one of the passengers, say that the cargo was to go across the river from Matamoras into Texas. Although this is hearsay evidence, yet, in a prize case, such evidence is sometimes the most reliable to prove the destination of the vessel and cargo. Tregidgo says that Heyck told him that he belonged to Texas. Heyck left the vessel at Key West, with Mohl and two other passengers. If it was intended that the cargo should be carried across the river from Matamoras into Texas, it was to be delivered directly into the enemy's country, and for the enemy's use, and its transit through Matamoras, for that purpose, would not be for any purpose of lawful commerce at Matamoras, nor would it impress upon the cargo a neutral destination.

Upon all the proofs in the case, therefore, notwithstanding the ostensible destination of the Peterhoff to neutral waters at the mouth of the Rio Grande, the actual hostile destination of the cargo must be considered as established. In arriving at this conclusion, I have, as heretofore stated, not given any weight to the circular letter of James I. Bennett & Wake, of November 24, 1862, produced upon the hearing, nor do I regard it as necessary, in consequence of any doubt I have as to the proper disposition to be made of this case, to open the case for further proof, in order to allow the introduction of that letter in evidence. It is apparent, from a mere reading of the letter, that every circumstance proved in evidence, in respect to the Peterhoff and her cargo, is entirely consistent with the course of trade, marked out so specifically in the letter, in respect to carrying goods into the country of the enemy and bringing back cotton in return, and it is entirely inconsistent with any honest destination of the cargo to a Mexican market, for use or sale there. In addition, we have the facts, brought to light in the correspondence of October 27, 1862, between Pile, Spence & Co.

and their brokers, that the Peterhoff was to bring home a cargo of cotton from the Rio Grande; the recommendation, in the circular letter, of Redgate, as being an "expert in cotton," "resident nearly forty years in Texas and Mexico," and a gentleman whose services would be "of great value to shippers, in respect to his local knowledge and influence, as also as regards agency of the inland transit, and landing and shipping of goods and cotton;" the fact, stated in the circular letter, that it was written for the guidance of those who might be "desirous of shipping to America," not to Mexico; the facts, stated in that letter, that "a Mr. Besbie, of the Confederate States of America, holds a contract from that government, whereby he is to receive 100 per cent. on invoice cost, payable in cotton, at specie value, clear of all charges of freight, &c., for any goods he may deliver into the Confederate States"; that such contract "has been authenticated by Mr. Mason and others," and that Besbie is willing to share the same, "say to the extent of 50 per cent., with any houses who may feel inclined to ship;" the facts, that Besbie, as testified to by several witnesses, came on board of the Peterhoff at Plymouth, and left her again at Falmouth, that he was an American, and an officer in the "Confederate" army, and had his sword with him, and that, when he left the vessel, he announced his intention of going out to Mexico by another conveyance; the fact, that the circular letter announces that shippers may send out their own supercargoes, that they need not avail themselves of Besbie's contract, but that, if they do not, they will not be sure of getting cotton, "as the wagon traffic cannot be properly carried on without the aid of government support in the shape of teamsters to attend to cattle, and which the Confederate government will supply from the army, to facilitate the inland transport of goods, and the bringing back of cotton for the contract;" and that, "in the event of peace, the Confederate government, by the contract, binds itself to receive goods that are shipped but not delivered, and, for any orders not shipped, but in course of same, 10 per cent. profit upon invoice cost and charges." The contents of the circular letter, when viewed in the light of the evidence in the case, would, therefore, entirely warrant the court in holding that that letter, if necessary to be proved, and if proved in a proper manner, would be very material evidence to show the real character of the voyage of the Peterhoff, and the true destination of her cargo.

Contraband articles, destined for the use of the enemy, were found on board of the Peterhoff, covered by bills of lading indorsed to each of the claimants on the record, namely, Captain Jarman, Redgate and Almond, and Bowden, who is represented by Redgate. Contraband articles were also found, destined for the use of the enemy,

shipped by Spence, the owner of the vessel. Therefore, all the claimants of the vessel and cargo had on board contraband articles, which were destined to be delivered, directly, or indirectly by transshipments, into the enemy's country, and for the use of the enemy, and not for a sale or disposition in the neutral market of Mexico. The evidence is clear, that all the cargo on board was really represented by, and under the control of, Captain Jarman, Redgate, Almond, and Bowden. Consequently, not only were the contraband articles subject to lawful capture by a vessel of the United States, but the other articles on board, belonging to or represented by Captain Jarman, Redgate, Almond, Bowden, and Spence, embracing the entire cargo of the vessel, were subject to like lawful capture, notwithstanding the vessel was, at the time of her capture, on an ostensible voyage from England to neutral waters at the mouth of the Rio Grande.

The settled rule of law is that where contraband articles, destined for the use of the enemy, are found on board of a vessel, all other goods on board of that vessel belonging to the owner of the contraband articles, even those goods which are innocent, must share the fate of the contraband goods. Halleck, Int. Law, c. 24, § 6, p. 573; 3 Phillim. Int. Law, § 277; 2 Wildm. Int. Law, 217; The Sarah Christina, 1 C. Rob. Adm. 237. I have already, in this opinion, referred to the authorities which establish the principles of prize law which lead to the condemnation of this cargo. I discussed those principles very fully in the cases of The Stephen Hart [supra] and The Springbok [supra], but there are some features in the present case which demand special remark. The Stephen Hart was bound, on her papers, to Cardenas, in Cuba, and The Springbok to Nassau, N. P. Those parts, though sufficiently near the country of the enemy to induce their use for the trade in which those vessels were engaged, were yet sufficiently distant to expose their cargoes to great hazard of capture in their transit, after transshipment from those ports, to the enemy's ports. But the transit of the cargo of the Peterhoff from the neutral waters at the mouth of the Rio Grande into the enemy's country would have been attended with no danger whatever, those neutral waters being on the very border of the enemy's country. Every bill of lading of the cargo of the Peterhoff (and the thirty-nine bills of lading found on board covered the entire cargo) contains a provision that the goods are to be taken from alongside of the ship at the mouth of the Rio Grande, within thirty days, in lighters, provided such lighters can cross the bar; and the stipulation on the part of the vessel, in every bill of lading, is, to deliver the goods on the Rio Grande, in the Gulf of Mexico. After the lighters had crossed the bar, and ascended the Rio Grande, which is the dividing line between the country of the enemy and Mexico, their freight might as well and as se-

curely be delivered in the enemy's country, on the left bank, as in the Mexican territory, on the right bank; and any transit of the goods through Matamoras, on their way to Texas, could not deprive the goods of the destination to the enemy's country, originally intended for and impressed upon them. If a pretended neutral commerce of this character, enjoying such facilities for the introduction of contraband goods into the enemy's country, can be carried on without interference, and if the ostensible destination of a vessel, on her papers, to neutral waters at the mouth of the Rio Grande, be sufficient, even when attended by all the circumstances which appear in evidence in this case, in respect to the vessel and her cargo, to exempt both from seizure and condemnation, a very wide door will have been opened for the practice of fraud upon the belligerent rights of the United States; and the commerce of neutrals with the enemy, in supplying them with contraband articles, can go on in safety to an unlimited extent. The naked doctrine upon which this immunity is sought to be upheld is, that whatever the character of the cargo, and whatever its ulterior destination, it is protected from lawful capture, so long as the vessel on board of which it is laden is pursuing a voyage between neutral ports. The unsoundness of this doctrine has been fully demonstrated.

There is another principle of law, which has been applied by the court of admiralty in England to cases like the present one, and which has been pressed upon the court in this case by the special counsel for the captors. He maintains that, where the neutral port or neutral territory lies in such immediate proximity to a port or territory of the enemy as to render it impossible to prevent contraband articles from going immediately from one port or territory to the other, it is as much a violation of neutral obligations, to be followed by confiscation of the property when seized, to introduce contraband articles into the port or territory of the neutral in time of war, as it is to carry them directly to the enemy's port or territory: that such was the position of the neutral waters at the mouth of the Rio Grande, and of the neutral port of Matamoras, in respect to the state of Texas and the port of Brownsville; that lighters, laden with contraband articles, leaving a vessel at the mouth of the Rio Grande, and ascending that river to deliver their freight at Matamoras, might as well deliver it at Brownsville, directly opposite, so far as regards the possibility of preventing such contraband articles from reaching the enemy; and that it is not a sound proposition, that the proximity of a neutral port to the country of the enemy cannot in any manner affect or impair neutral rights, in respect to commerce with such neutral port. We have, indeed, the high authority of Sir William Scott for saying that the enforcement of belligerent rights demands and justifies a restriction upon the commerce of neutrals with a neutral

port thus situated; and he enforced such restriction. In The Zelden Rust, 6 C. Rob. Adm. 93, a quantity of Dutch cheese, a contraband article, was on board of a vessel destined to Corunna, in Spain. It was contended by the king's advocate that a destination to Corunna, a lawful port, was, in fact, a destination to Ferrol, an unlawful port, since those ports were both in the same bay, and so situated as to render it impossible to prevent supplies from going immediately to Ferrol, for the use of the Spanish navy, if they were permitted to enter the bay unmolested, under an asserted destination to Corunna. Sir William Scott, after holding cheese to be a contraband article, says: "Corunna is, I believe, itself a place of naval equipment in some degree; and if not so exclusively, and in its prominent character, yet, from its vicinity to Ferrol, it is almost identified with that port. These ports are situated in the same bay, and, if the supply is permitted to be imported into the bay, it would, I conceive, be impossible to prevent it from going on immediately, and in the same conveyance, to Ferrol. There is, in this respect, a material difference between the present case and the case which happened yesterday," (The Frau Margaretha, 6 C. Rob. Adm. 92,) "of similar articles going to Quimper. That port, though in the vicinity of Brest, is situated on the opposite side of a projecting headland or promontory, so as not to admit of an immediate communication, except by land carriage. Without meaning to interfere with the principles of that decision, I think myself warranted to consider this cargo, on the present destination, as contraband, and, as such, subject to condemnation." On the principle of this decision, the cargo of the Peterhoff was lawfully captured, and liable to condemnation, even though it was honestly destined to the port of Matamoras, to be there used or sold.

The principle thus maintained in the case of The Zelden Rust, is recognized in the decision of the same judge in the case of The Maria, 6 C. Rob. Adm. 201. In that case, the French then enemies of Great Britain, were in possession of one bank of the river Weser, the neutral port of Bremen being on the other bank; and a blockade of the river had been instituted by Great Britain. The cargo of the vessel was sent from Bremen, in lighters, to the Jade, to be shipped to America, while the vessel herself went in ballast from the Weser to the Jade, and there took on board her cargo. In delivering his opinion, in that case, Sir William Scott says (page 203): "A blockade imposed on the Weser must, in its nature, be held to affect the commerce of Bremen; because, if the commerce of all the towns situated on that river is allowed, it would be only to say, in more indirect language, that the blockade itself did not exist. It cannot be doubted, then, on general principles, that these goods would be subject to condemnation, as hav-

ing been conveyed through the Weser; and whether that was affected in large vessels or in small, would be perfectly insignificant. That they were brought through the mouth of the blockaded river, for the purpose of being shipped for exportation, would subject them to being considered as taken on a continued voyage, and as liable to all the same principles that are applied to a direct voyage, of which the terminus a quo and the terminus ad quem are precisely the same as those of the more circuitous destination." Thus, the court of admiralty of Great Britain condemned contraband goods going to the neutral port of Corunna, where there was no suspicion of there being destined to the hostile port of Ferrol, upon the sole ground that it would be impossible to prevent those articles, when they reached Corunna, from going immediately to Ferrol, if they were permitted to enter, unmolested, waters that were common to both of those ports. And the same court condemned goods which were carried from the neutral port of Bremen, through the mouth of the blockaded river, on which it is situated, upon the ground that the blockade could not exist for any practical purpose. unless the commerce of Bremen, although neutral, was to be affected by it; and it held the doctrine that, if goods could not reach the sea from Bremen without going through the blockaded waters, they could not depart from Bremen at all. The necessity of the case was held, under the law of nations, to justify, in the one case, the stoppage of commerce in contraband articles to Corunna; and, in the other case, the stoppage of all commerce from Bremen. The justification for the rule urged in the one case was, that the articles, if permitted to go to Corunna, could not be prevented from going to Ferrol; and, in the other case, that the blockade could not exist without affecting the commerce of Bremen. These principles, if applied by this court to the case of the Peterhoff, as being necessary for the maintenance of the belligerent rights of the United States, with respect to the neutral waters off the mouth of the Rio Grande, and to commerce with the port of Matamoras, would justify the condemnation of the cargo, not only the contraband portion, but that which was not contraband. I am not prepared, however, to apply those principles to this case, or to express an approval or disapproval of their soundness. The necessities of the case do not, in my opinion, demand a decision upon those points.

It is apparent, from the terms of the correspondence of October 27, 1862, between James I. Bennett & Wake, and Pile, Spence & Co., that the adventure of the Peterhoff, in taking out a cargo to the Rio Grande, with the intention of bringing home, in return, a cargo of cotton, was an adventure in which James I. Bennett & Wake, as brokers, and Pile, Spence & Co., as representing Joseph Spence, a member of that firm, and the owner of the Peterhoff, were to be interested jointly. No charter of the vessel from Spence to any person has been produced, unless the correspondence referred to is to be considered as a charter. James I. Bennett & Wake were employed as brokers by Pile, Spence & Co., on behalf of Spence, to obtain the outward cargo for the vessel, and, as such brokers, their names appear on the manifest. Captain Jarman says that he was appointed to the command of the vessel by Spence, and that she was delivered to him by Spence. According to the well settled rule of law, therefore, Spence must be held responsible for all that was done by his agent, Captain Jarman, and for the employment of the vessel by Captain Jarman, knowingly, in carrying contraband articles to the country of the enemy, irrespective of the fact that Spence himself shipped on board of her, as an adventure, 90 coils of tarred hemp rope, which are found to have been contraband articles going to the country of the enemy, and also the cotton press, and the smiths' bellows and anvils, and various other articles. Where the vessel belongs to the owner of the contraband articles, or where there are circumstances of fraud as to the papers or the destination of the vessel or the cargo, and thus an attempt, under colorable appearances, to defeat the rights of a belligerent, the vessel which carries the contraband articles will be condemned, and the penalty on the vessel will not be limited merely to a loss of freight and expenses. The Ringende Jacob, 1 C. Rob. Adm. 89; The Jonge Tobias, Id. 329; The Franklin, 3 C. Rob. Adm. 217. So, too, the vessel will be condemned, not only where her owner is privy to the carriage of contraband, but where the master of the vessel, as the agent of such owner, interposes so actively in the fraud as to consent to give additional color to it by sailing with false papers. The Franklin, 3 C. Rob. Adm. 217, 221, note; The Mercurius, 1 C. Rob. Adm. 288, note; The Edward, 4 C. Rob. Adm. 68; The Neutralitet, 3 C. Rob. Adm. 295; Carrington v. Merchants' Insurance Co., 8 Pet. [33 U. S.] 495, 520, 521. So, also, if the owner of a vessel places it under the control of a master, who permits it to carry, under false papers, contraband goods, ostensibly destined to a neutral port, but in reality going to the country of the enemy, he must sustain the consequence of such misconduct on the part of his agent. The Ranger, 6 C. Rob. Adm. 125; Jecker v. Montgomery, 18 How. [59 U. S.] 116, 119; The Mercurius, 1 C. Rob. Adm. 80. A neutral owner of a vessel is, as a general rule, held responsible for all the acts of the master of his vessel, committed in violation of the rights of a belligerent. The Vrouw Judith, 1 C. Rob. Adm. 150; The Columbia, Id. 154; The Hiawatha, 2 Black [67 U. S.] 635, 678. I can come to no other conclusion in this case than that the acts of

Captain Jarman, in signing bills of lading of the character of those in the present case, and in sailing with a manifest giving no adequate information as to the contraband goods on board, and in causing the destruction of papers, and in fabricating the absurd story about the white powder, and, in addition, in testifying that the vessel, the whole of whose cargo, except the cases directed to Burchard & Co., was, as he says, represented by Almond, Redgate, Bowden and himself, had no goods on board which he considers contraband of war, and in averring his inability to specify the contents of his cargo, when he himself was the indorsee of bills of lading covering contraband articles, must be regarded as evidence that he entered upon a systematic course of concealment of the real character of the contraband articles on board, so as to subject the vessel to condemnation as the result of such fraud, when, under other circumstances, she might go free, even though her cargo was confiscated. Moseley, Contr. War, 97, 98. A master is, in time of war, bound to know the contents of his cargo, and cannot be permitted to aver his ignorance of the contents of contraband packages on board of his vessel. The Oster Risoer, 4 C. Rob. Adm. 199.

The capture of the Peterhoff on the high seas, at the place of her capture, was lawful. From the moment a vessel, having on board contraband articles, which have a destination to the enemy's country, leaves her port of departure, she may be legally captured; and it is not necessary to wait until the goods are actually endeavoring to enter the enemy's country, the penalty attaching the moment the illegal transportation commences. Halleck, Int. Law, c. 24, § 7, p. 573; 2 Wildm. Int. Law, 218; 1 Duer, Ins. 626, § 7; The Imina, 3 C. Rob. Adm. 167; The Trende Sostre, 6 C. Rob. Adm. 390, note; The Columbia, 1 C. Rob. Adm. 154; The Neptunas, 2 C. Rob. Adm. 110.

An appeal to the supreme court was taken in this case within ten days after the decree was made, and the vessel was taken by the navy department, for the use of the government, at an appraised valuation of $80,000. No application was made to the court, on the part of the claimants, for leave to put in further proof, and most clearly this is not a case where the privilege of further proof would be tendered to the claimants.

The vessel and cargo are, both of them, condemned.

[NOTE. On appeal to the supreme court the decree of this court was reversed, except as to a part of the cargo, and as to that affirmed. 5 Wall. (72 U. S.) 28. Pending the appeal in the supreme court, the district court refused to order the costs of the prize commissioner to be paid out of the funds of this case, holding that the appeal removed the cause from that court, and placed the prize property exclusively under the control of the appellate court. Case No. 11,025.]

